# Illinois Official Reports

## Appellate Court

*In re Z.J.*, 2020 IL App (2d) 190824

| | |
|---|---|
| Appellate Court Caption | *In re* Z.J., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Lisa A.J., Respondent-Appellant). |
| District & No. | Second District<br>No. 2-19-0824 |
| Filed | March 26, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 14-JA-361; the Hon. Francis Martinez, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Gary D. McGuane, of DeKalb, for appellant.<br><br>Marilyn Hite Ross, State's Attorney, of Rockford (Patrick Delfino, Edward R. Psenicka, and Diane Campbell, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE HUDSON delivered the judgment of the court, with opinion.<br>Presiding Justice Birkett and Justice Burke concurred in the judgment and opinion. |

**OPINION**

**I. INTRODUCTION**

Respondent, Lisa A.J., appeals from an order of the circuit court of Winnebago County, finding that she was an unfit parent and that it was in the best interests of her minor biological son, Z.J., that her parental rights be terminated. On appeal,[1] respondent raises four principal issues. First, she contends that the trial court's finding that she was unfit was against the manifest weight of the evidence because "virtually all of the evidence offered by the state consisted of multi-level hearsay" for which the State laid "no proper foundation." Second, she challenges the trial court's finding that it was in Z.J.'s best interests to terminate her parental rights, arguing again that virtually all of the State's evidence consisted of multilevel hearsay and that the remaining, admissible evidence was insufficient to sustain the State's burden of proof. Third, respondent maintains that she was denied the effective assistance of counsel. Fourth, respondent argues that her due process rights were violated because the judge who presided over the proceedings leading up to the filing of the motion to terminate her parental rights also presided over both the unfitness and best interest phases of the termination hearing. For the reasons set forth below, we affirm.

**II. BACKGROUND**

Z.J. was born on October 24, 2004, and has been diagnosed with autism spectrum disorder (autism), disruptive mood dysregulation disorder, and attention-deficit/hyperactivity disorder (ADHD). Respondent identified Edward D. as Z.J.'s putative biological father, but Edward did not participate in the underlying proceedings and is not a party to this appeal. On October 21, 2014, the State filed a three-count petition alleging that Z.J. was a neglected and abused minor. The first two counts alleged that Z.J. was neglected based on an injurious environment, thereby placing him at risk of harm in that respondent's paramour, Daniel A., struck Z.J. with an object (count I) and grabbed Z.J., causing bruising (count II). 705 ILCS 405/2-3(1)(b) (West 2014). Count III alleged that Z.J. was an abused minor in that Daniel created a substantial risk of physical injury to Z.J., other than by accidental means, which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function, by grabbing Z.J., causing bruising. 705 ILCS 405/2-3(2)(ii) (West 2014).

**A. Shelter Care and Neglect Adjudication**

The matter proceeded to a shelter-care hearing on October 21, 2014, which respondent attended. The court appointed an assistant public defender to represent respondent and a guardian *ad litem* (GAL) to represent Z.J.'s interests. The State submitted a statement of facts that provided in relevant part as follows. On October 17, 2014, the Illinois Child Abuse Hotline received a call that Z.J. was observed with "two blue bruises *** larger than a quarter" on the front of his chest. Z.J. had told the caller that on October 15, 2014, his "stepfather," Daniel A., grabbed him "very hard in the chest" because he did not finish his homework. Z.J. further

---

[1]Justice Michael J. Burke participated in this appeal but has since been appointed to the Illinois Supreme Court. Our supreme court has held that the departure of a judge prior to the filing date will not affect the validity of a decision so long as the remaining two judges concur. *Proctor v. Upjohn Co.*, 175 Ill. 2d 394, 396 (1997).

related that respondent was present when the incident occurred. The caller represented that Daniel was a registered sex offender. When a child protection investigator subsequently met with Z.J., respondent, and Daniel, Z.J. told the investigator that the bruises developed when Daniel "grabbed his shirt and pulled it up so high that *** his belly was showing" after Z.J. refused to do his homework. Z.J. confirmed that respondent was present when Daniel grabbed him. Respondent denied that Daniel touched Z.J. and accused the Illinois Department of Children and Family Services (DCFS) and others of harassing her. According to Daniel, when Z.J. refused to do his homework, Daniel put Z.J. "in a corner." Daniel denied grabbing Z.J. by his shirt. Z.J. was taken into protective custody and placed in the home of a relative.

¶ 7 After providing respondent with several admonishments, the court recessed to allow the parties to discuss the matter. When the hearing resumed, the State announced that respondent had agreed to waive her right to a temporary custody hearing and also agreed that (1) there was probable cause to believe that Z.J. was abused and neglected, (2) there was urgent and immediate necessity to remove Z.J. from his home, (3) DCFS used reasonable efforts in removing Z.J., (4) temporary guardianship and custody would be placed with DCFS, which would have discretion to place Z.J. with a responsible relative or in traditional foster care, and (5) visitation between Z.J. and respondent would take place at the discretion of DCFS. The court accepted the parties' agreement and entered a temporary custody order, a protective order, and a supplemental protective order in accordance therewith. At a subsequent hearing, the trial court assigned a Court Appointed Special Advocate (CASA) to the case and scheduled an adjudicatory hearing. On January 14, 2015, respondent appeared before the court and factually stipulated to count II of the neglect petition, based on the original statement of facts. The State dismissed counts I and III of the petition with the understanding that any services would be based on all three counts.

¶ 8 On March 25, 2015, the parties appeared for a dispositional hearing. At the commencement of the hearing, the trial court noted that it had received two reports for the hearing, one from the caseworker assigned to the family and one from the CASA. The court then recessed the proceeding to allow the parties to confer. Thereafter, the State announced that "the parents are going to be found unfit or—well, unable to care for the minor at this time." The parties further agreed that (1) DCFS would retain guardianship and custody with discretion to place Z.J. with a responsible relative or in traditional foster care, (2) visitation between respondent and Z.J. would be at the discretion of DCFS, and (3) all prior orders would remain in place. The State explained that the factual basis for the agreement was "the court report that had been prepared for today." The court accepted the parties' agreement and entered an order in accordance therewith.

¶ 9 B. Permanency Review Hearings and Motion to Terminate Parental Rights

¶ 10 In the months and years that followed the dispositional hearing, the trial court held 10 permanency review hearings. During this time, Z.J. had various placements, including with relatives, in foster care, and at hospitals. Because of aggressive behavior, however, Z.J. was moved in March 2016 to the Cunningham Children's Home (Cunningham) in Urbana. The record indicates that, while at Cunningham, Z.J. has been involved in many incidents of physical and verbal aggression, including biting himself and staff members, hitting and kicking staff members, and using racial slurs toward staff and other residents.

¶ 11    At each permanency review hearing, the court received from the caseworker then assigned to the family a report detailing the family's progress. The reports included the family's service plans, which identified several tasks for respondent, including (1) participation in parenting classes, (2) participation in individual counseling, (3) participation in couple's counseling, (4) participation in educational groups for children with autism or developmental disabilities, (5) compliance with agency recommendations, and (6) participation in family therapy. Respondent was also asked to draft a safety plan for Z.J.'s return home and maintain visitation with Z.J.

¶ 12    The first permanency-review hearing was held on July 21, 2015. In her report to the court, caseworker Megan Grooms-Alberto noted that respondent had begun parenting classes, had been cooperative with the agency managing her case (Children's Home and Aid), and had expressed a willingness to participate in other tasks identified in the service plan, including individual counseling and educational groups for children with autism and developmental disabilities. Grooms-Alberto indicated that she would refer respondent (and Daniel) to couple's therapy when respondent's therapist deemed it clinically appropriate. Although Grooms-Alberto opined that respondent had made reasonable efforts during the review period and recommended a permanency goal of "return home within 12 months," she voiced concern that respondent had not developed a safety plan. At the hearing, the parties and the GAL agreed to stand on the caseworker's report. The court agreed that respondent had made reasonable efforts and that a goal of return home within 12 months was appropriate.

¶ 13    Over the course of the next five review periods, Grooms-Alberto was succeeded as the family's caseworker, first by Ashley Trosper and then by Cammarie Mayzes, who was assigned to the family in December 2016. The caseworkers' reports during this time reflected that, while respondent was generally cooperative with the agency and completed certain tasks identified in the service plans, she struggled with or did not participate in other tasks. For instance, while respondent completed parenting classes and an initial round of individual counseling, she failed to attend training for children with autism and struggled to develop a safety plan. Respondent was found to have made reasonable efforts and/or reasonable progress during some of the review periods, but not all of them. Throughout this period, the trial court maintained the permanency goal of return home.

¶ 14    At the seventh permanency review hearing, on January 24, 2018, Mayzes and respondent testified. Mayzes testified that she had asked respondent to engage in autism-support services with Easter Seals and attend more visits with Z.J., but respondent refused both requests. Respondent told Mayzes that work obligations prevented her from engaging in services with Easter Seals, but she did not provide a reason for refusing to attend more visits with Z.J. Mayzes also testified that there had been some complications related to the visits, culminating in a staffing with DCFS in July 2017. As a result of the staffing, DCFS recommended that Daniel not participate in the visits and that respondent not mention Daniel during her visits. Mayzes explained that this was because respondent "push[es] Daniel onto [Z.J.]," sometimes resulting in Z.J.'s behaviors becoming "escalated." Although this was explained to respondent, she continued to talk about Daniel during visits. Mayzes noted that, because respondent was married to Daniel, Z.J. would have to "get comfortable" with Daniel in order to return home. Mayzes testified that the agency wanted respondent to complete counseling and a psychological assessment before determining that returning home was not a viable option.

- 4 -

¶ 15    Respondent testified that she attended services through Easter Seals but stopped going five or six months earlier because of work obligations. Respondent planned to reengage in services when her work schedule allowed. Respondent attributed her failure to visit Z.J. more often to the cost of driving to Urbana. She noted that, although the agency provided her with "gas cards," they did not cover the entire cost of the trip. She testified that, if she were to receive additional financial assistance, she would visit more frequently. Respondent acknowledged that, if Z.J. returned home, he would require constant supervision. She testified that she had a babysitter in place to watch Z.J. after school while she was at work. Respondent initially testified that the babysitter could provide "one-on-one supervision" for Z.J. However, she could not remember the babysitter's name and later acknowledged that the babysitter would be caring for up to 12 children at a time.

¶ 16    The trial court concluded that respondent had not made reasonable efforts or reasonable progress during the review period. The court remarked that Z.J.'s needs were "great" and "extraordinary" but that respondent did not seem to understand "exactly what we are dealing with here." The court elaborated:

> "I mean the testimony is that the care plan is a baby-sitter whose name she doesn't know, who has got a license to take care of 12 kids. Well, it's obvious as the nose is on her face this child can't be in a facility where 1 person or 2 people are caring for 12 children, he being 1. That's not going to happen. I don't believe that I have been shown that [respondent] has a grasp as long as this case has been going on with exactly how dire [Z.J.'s] circumstances are. Perhaps with more education we will figure that out, but [Z.J.], it would be easier to return an infant than [Z.J.], who presents greater challenges to the average family than an infant would *** present."

The court stated that it was not prepared to change the permanency goal until respondent underwent a psychological assessment, but it acknowledged that a goal of return home was "a very bleak prognosis." As a result, the court kept the permanency goal at return home within 12 months.

¶ 17    In February 2018, respondent underwent a psychological evaluation by Dr. Valerie Bouchard. Mayzes received the assessment in May 2018 and noted the following. Respondent presented with a WAIS-IV full-scale IQ score of 76, representing intellectual functioning in the "borderline range." Respondent reported that she had not completed autism training with Easter Seals, because "the program expected too much of parents who needed to work to support their families in order to have a home for a child to return." Respondent did not adequately understand autism and, specifically, the limitations of Z.J.'s functioning. Respondent did not have an adequate care plan for Z.J. if he were to be returned to her. Respondent minimized concerns about Daniel and his interpersonal difficulties with Z.J. Respondent's judgment and insight were poor. Respondent exhibited significant dependency. Respondent did not take personal responsibility for the circumstances that led to Z.J. coming into care, instead blaming others for his removal. Dr. Bouchard diagnosed respondent with dependent personality disorder, adjustment disorder with depressed mood, and borderline intellectual functioning. Dr. Bouchard opined that respondent's prognosis for successful progress toward reunification was poor. Dr. Bouchard's recommendations for respondent included the following: (1) completing Easter Seals programs for training on autism; (2) following through with the visitation plan for Z.J. and informing him that she is making the

choice to be with him, even when Daniel cannot attend visits; and (3) participating with Daniel in couple's therapy to work on understanding Z.J.'s issues due to his autism.

¶ 18 The eighth permanency review hearing took place on June 25, 2018. In her report, Mayzes concluded that the permanency goal of return home could not be achieved because respondent's mental health issues had to be addressed. Further, respondent and Daniel needed to engage in services offered by Easter Seals and complete individual counseling, couple's therapy, and a class that focuses on parenting children with mental health and autism issues. Mayzes noted that respondent had failed to engage in needed services, had denied any physical abuse of Z.J., and had been inconsistent in visitation and phone contact with Z.J. Moreover, respondent continued her relationship with Daniel, who denied that he had done anything wrong and said that corporal punishment was appropriate for Z.J. Mayzes noted that respondent had made no progress in over a year toward Z.J.'s return home. As such, the caseworker recommended a goal of return home within 12 months pending a legal screen by DCFS.

¶ 19 At the hearing, the State stood on the caseworker's report and argued that respondent had not made reasonable efforts or reasonable progress. The State believed that returning home was not in Z.J.'s best interests or a viable option in the near future, given how long the case had been open. As to the appropriate permanency goal, the State represented that this presented "a bit of a Catch 22." The State explained that Z.J. was placed at a residential facility and that it was "hesitant" to recommend termination of parental rights without Z.J. being in a foster home. However, to find Z.J. a foster home, the goal must be changed to "at least substitute care or adoption." Accordingly, the State recommended a permanency goal of substitute care pending a court determination on termination of parental rights. The State indicated, however, that it did not intend to begin proceedings to terminate respondent's parental rights until it had "some idea of possibility of placements."

¶ 20 Respondent's counsel argued that, because the psychological assessment was "so new" and respondent had been diagnosed with "significant mental health issues," the agency should receive additional time to provide services to respondent. Respondent's counsel therefore asked the court to find that respondent had made reasonable efforts, defer a finding of reasonable progress, and keep the permanency goal at return home within 12 months.

¶ 21 The GAL also argued that respondent had not made reasonable efforts or reasonable progress during the review period. The GAL recommended changing the permanency goal to substitute care pending a court determination on termination of parental rights. In support of this recommendation, the GAL noted that, from February 2018 until the date of the hearing, respondent had visited Z.J. only twice, she had not completed training relative to coping with the behaviors of an autistic child, she continued to deny that Z.J. came into care because of Daniel's physical abuse of Z.J., and she continued to be in a relationship with Daniel, who saw nothing wrong with using corporal punishment for an autistic child.

¶ 22 The court concluded that respondent had failed to make reasonable efforts or reasonable progress during the review period and that it was appropriate to change the permanency goal to substitute care pending a court determination of termination of parental rights. The court explained its decision in relevant part as follows:

> "The case is *** three years old. *** And it appears to be the consensus except from the parents, of course, but—that the prognosis for reunification because of the

condition of the child and the ability of the parents, the prognosis is rather dim. It doesn't appear that—It doesn't appear that further services are going to be successful.

It's not—It's not fun to do this sort of thing. But I will—I will change the goal. I know there's not been a screening. [DCFS] has correctly said that the legal screening simply is the legal department's position or their own agency as to whether there is clear and convincing evidence of unfitness and best interests and a preponderance of the evidence. I think the court can also in a sense do that screening based on the history of the case. That's why the court has the ability to change the goal. And it does appear that that's the case.

Now whether we wish to proceed given the condition of the child, that's a different story.

* * *

I am not really basing my decision on the visitation issue. Visitation is certainly data. But—Well, I guess let me put it this way. The lack of visitation certainly is a negative. But visitation if it had been diligent is not necessarily curative of all of the other problems. It doesn't work both ways. Really I am really noting just the inability. . . I am not using the word failure but the inability to grasp the parenting skills that are necessary to reunify these parties."

¶ 23 On December 7, 2018, the State filed a motion for termination of parental rights. The State alleged that respondent was an unfit parent in that she failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to Z.J.'s welfare (750 ILCS 50/1(D)(b) (West 2018)), (2) failed to make reasonable efforts to correct the conditions that caused Z.J.'s removal, during the periods from February 16, 2017, through November 16, 2017, and September 25, 2017, through June 25, 2018 (750 ILCS 50/1(D)(m)(i) (West 2018)), and (3) failed to make reasonable progress toward Z.J.'s return home during the same two periods (750 ILCS 50/1(D)(m)(ii) (West 2018)).

¶ 24 Meanwhile, the ninth permanency review hearing was held on December 10, 2018. Mayzes reported that since the permanency goal was changed to substitute care pending a court determination on termination of parental rights, neither respondent nor Daniel were involved in any services, communicated with the agency, or attended agency meetings. Respondent did visit Z.J. for one hour each month during the review period, except for November. Mayzes also noted that the agency had made special arrangements so respondent could visit Z.J. on his birthday but that respondent arrived late and missed his party. Mayzes opined that respondent's conduct demonstrated "the lack of investment in [Z.J.'s] life and putting his needs first." Mayzes reported that, during phone conversations, Z.J. would lead the conversation and respondent did not seem interested. Moreover, during the last visit supervised by Mayzes, respondent brought up Daniel, prompting Mayzes to redirect the conversation. Mayzes reported that, since respondent had decreased her involvement with Z.J., he had been involved in fewer incidents at Cunningham. Mayzes recommended that the court terminate respondent's parental rights. The State informed the court that Z.J. was still residing at Cunningham and that the State was "holding off" on moving forward with the termination as it "tr[ied] to figure out placement." Accordingly, the trial court stated that it would not move forward on the motion to terminate parental rights, and it kept the goal at substitute care pending a court determination on termination of parental rights.

¶ 25    At a status hearing on February 19, 2019, Mayzes submitted a report on Z.J.'s placement. Mayzes noted that respondent's contact with Z.J. and the agency continued to be inconsistent. Z.J.'s therapist recommended suspending respondent's visits because respondent's inconsistency had impacted Z.J. emotionally. In this regard, Mayzes noted that, during the review period, Z.J.'s incidents of physically aggressive behavior had increased. Mayzes also indicated that a permanent home had not been found for Z.J. Mayzes contacted a woman considered "fictive kin"[2] in Colorado, but she did not return Mayzes's call. Mayzes was awaiting a response from a placement in Rockford. Z.J. had been placed on the Adoption Listing Service, but no matches had been found.

¶ 26    The tenth permanency review hearing was held on May 14, 2019. In her report to the court, Mayzes noted that, during the review period, respondent and Daniel had not engaged in any services toward Z.J.'s return home. Further, respondent had not returned Mayzes's calls, e-mails, or letters; she denied that Z.J. had been physically abused; she had been inconsistent in visiting and calling Z.J.; she ceased cooperating with the agency; and she continued her relationship with Daniel, who continued to deny that he has done anything wrong and that corporal punishment was inappropriate for Z.J. Mayzes also expressed concern about respondent's ability to safely protect Z.J. Mayzes recommended a permanency goal of substitute care pending a court determination on termination of parental rights, noting that, while Z.J. did not have a placement at the time, having a "concrete answer/goal of what is going to happen in his future ([respondent's] rights being terminated) could provide a form of closure." The trial court noted that it did not need to "grade" respondent and Daniel, as the permanency goal had previously been changed to substitute care pending a court determination on termination of parental rights.

¶ 27                            C. Unfitness Hearing

¶ 28    The unfitness phase of the termination hearing was held on July 17, 2019. Although respondent did not attend, her attorney was present and participated in the proceeding. Mayzes was the sole witness called by the State. She identified People's exhibits one through eight as copies of the family's service plans, and she testified that the exhibits "fairly and accurately reflect the copies [of the service plans] maintained in the [agency] file," the service plans were created in the regular course of business, and she retained copies of the service plans in her file. The trial court admitted the service plans without objection.

¶ 29    Mayzes noted that Z.J. had been diagnosed with various disorders, including autism and ADHD. Mayzes explained that because of these disorders, Z.J. had "fixations" and could become physically and verbally aggressive. As a result, whoever cared for Z.J. must know how to "appropriately parent" him. Mayzes testified that various services were recommended for respondent, including parenting classes, individual counseling, couple's counseling, family therapy, and an educational group for parents of children with autism. In addition, respondent was asked to cooperate with the agency, visit Z.J., and obtain stable housing and income.

_____

        [2]"Fictive kin" is a term used to refer to individuals who are not related to another individual by either birth or marriage but have an emotionally significant relationship with that individual that would take on the characteristics of a family relationship. "Fictive Kin Law and Legal Definition," USLegal, https://definitions.uslegal.com/f/fictive-kin/ (last visited Apr. 23, 2021) [https://perma.cc/XA2X-UUBZ].

Mayzes testified that, prior to December 2016, respondent had completed the parenting classes and individual counseling. Respondent and Daniel had been assessed for couple's counseling. In April 2017, respondent, Z.J., and Daniel began family therapy focused on how to parent Z.J. Family therapy was discontinued, however, because no progress was made when Daniel was present. The therapist told Mayzes that Daniel "wasn't fully engaged" and would make inappropriate comments, such as that "corporal punishment should be allowed."

¶ 30    After a clinical staffing in July 2017, several recommendations were made, including (1) the suspension of visits between Z.J. and Daniel, because Z.J.'s "behaviors increased" following contact with Daniel, (2) participation by respondent and Daniel in couple's counseling with a focus on how to parent Z.J., (3) a psychological evaluation of respondent, (4) participation by respondent in Easter Seals education focused on parenting children with autism, and (5) continuation of family therapy, without Daniel. Mayzes testified that, in January 2018, she referred respondent to reengage in individual counseling and that, in March 2018, respondent resumed individual counseling. Respondent and Daniel began couple's counseling in March 2018, but, after two or three sessions, the therapist recommended that respondent complete individual counseling before continuing couple's counseling. Thereafter, respondent and Daniel never reengaged in couple's counseling. Mayzes noted that, although respondent completed the recommended psychological evaluation, she did not engage in education for parenting children with autism after the July 2017 staffing. Moreover, while family counseling proceeded with just respondent and Z.J., the therapist reported that respondent "just wasn't getting the concepts or getting exactly how to parent." As of April 2018, respondent had not completed individual therapy, education for parenting children with autism, or family therapy. After the goal changed from return home to substitute care pending a court determination on termination of parental rights, respondent told Mayzes that she was not going to participate in any services.

¶ 31    On cross-examination by respondent's attorney, Mayzes acknowledged that respondent did not attend classes for parenting children with autism, because the agency wanted her to first complete individual counseling, couples counseling, family therapy, and the psychological evaluation. Mayzes further explained that, although respondent finished one "phase" of individual counseling, a second "phase" was recommended because respondent was still experiencing "issues" with respect to herself, her relationship, and her parenting.

¶ 32    On cross-examination by the GAL, Mayzes testified that Z.J. came into care because he was physically abused by Daniel. Respondent was present during the abuse. At the time, Daniel was respondent's boyfriend, but the couple married in February 2017. Mayzes noted that Daniel's status as a registered sex offender raised other concerns about Daniel being around Z.J. Respondent and Daniel had told Mayzes that one reason they got married was so that Daniel could be around Z.J. unsupervised. Mayzes further testified that respondent and Daniel were consistent in their belief that corporal punishment was not a problem, adding that Daniel had repeatedly indicated to his therapist and the agency that corporal punishment "within limits" was fine. According to Mayzes, one of the reasons Daniel and respondent were repeatedly referred for similar services was their failure to accept and process that corporal punishment is not an appropriate form of discipline for a minor with Z.J.'s diagnoses. Daniel and respondent were referred for similar services also because, upon completing the first phase of individual counseling, they stated that they understood why Z.J. came into care but later indicated that they did not understand why and insisted that the agency "was against them."

¶ 33    On redirect examination, Mayzes testified that, with respect to the round of services recommended after the July 2017 staffing, there was a progression of individual counseling, couple's counseling, family therapy, and parenting education. Although she wanted respondent to complete individual counseling, couple's counseling, and family therapy before attending the class for parenting children with autism, respondent also was supposed to attend educational groups through Easter Seals throughout the course of the case. Mayzes testified that respondent did not consistently attend the second round of referrals, much less the educational groups through Easter Seals.

¶ 34    On re-cross examination, Mayzes acknowledged that, to the best of her knowledge, Daniel was fully compliant with the sex offender registry. Mayzes testified that, although she was not aware of respondent attending any educational groups through Easter Seals, respondent did have "contact" with an Easter Seals representative. However, Mayzes was unaware of the capacity in which this contact occurred.

¶ 35    Following Mayzes's testimony, the court took judicial notice, without objection, of the neglect petition, the adjudication order, the dispositional order, and the orders following the permanency review hearings on January 24, 2018, and June 25, 2018. Neither respondent's attorney nor the GAL called any witnesses or sought the admission of any evidence.

¶ 36    After arguments by the State, respondent's attorney, and the GAL, the trial court found that the State had met its burden of proving respondent unfit by clear and convincing evidence on all three counts of its motion. First, the court concluded that the State established by clear and convincing evidence that respondent failed to show a reasonable degree of responsibility as to Z.J.'s welfare. In this regard, the court noted that when the case began respondent was engaging in services. However, it became clear that Z.J.'s mental health condition required a higher level of understanding to create a safe environment for him. The court found that this was where respondent "fail[ed] miserably." The court determined that no reasonable person could find it appropriate to administer corporal punishment to a child with Z.J.'s diagnoses. Yet, the court noted, respondent consistently agreed with Daniel that corporal punishment would be "perfectly acceptable." The court concluded that this demonstrated that respondent "did not assimilate *** any of the parenting skills necessary to take care of a child of this nature." Second, the court found that respondent was not prohibited from engaging in classes for parenting children with autism. Rather, she failed to fulfill the prerequisites required to engage in such classes. As such, the court concluded, respondent "abandoned any desire to engage in and learn the skills of parenting a child with autism by not engaging in the round of services necessary." Third, while recognizing that a person has a fundamental right to marry, the court found it "curious" that the purpose of respondent's marriage was to circumvent supervised visitation. The court also found Daniel's presence problematic for two more reasons. The court noted that Daniel was a registered sex offender and that, while Daniel complied with his registration, the court did not know whether he complied with any therapy or treatment that would authorize unsupervised visits with Z.J. Additionally, the court noted that Daniel perpetrated substantial physical abuse of Z.J.

¶ 37    The court also found that the State proved by clear and convincing evidence that respondent failed to make reasonable efforts or reasonable progress. In support, the court noted that respondent failed to engage in parenting education with Easter Seals. The court explained that, although respondent might have had some "contact" with an Easter Seals representative, "contact isn't engagement." The court also noted that it changed the permanency goal to

substitute care pending a court determination on termination of parental rights because respondent "clearly was not meeting the goals that she needed to meet in order to go toward reunification." The court acknowledged that respondent did engage in the first round of services, but it found that respondent failed to engage in the second round, which were the services necessary for a special-needs child such as Z.J.

¶ 38                          D. Best Interests Hearing

¶ 39    The court held the best interest hearing on September 17, 2019. Again, respondent did not attend the hearing, but her attorney was present, and Mayzes was the State's sole witness. Mayzes testified that Z.J. was 14 years old and had mental health issues, including autism, "disruptive disorder," and ADHD. Mayzes testified that, since coming into care in 2014, Z.J. had been placed with fictive kin, in traditional foster care, and at hospitals. However, due to his mental health and behavioral issues, he was eventually moved to Cunningham. Mayzes testified that Z.J.'s tentative discharge date from Cunningham was January 2020. Once discharged, Z.J. would reside with a traditional foster family located through the Adoption Listing Service.

¶ 40    Mayzes testified that the prospective foster mother had been fostering children for more than 25 years and had worked extensively with children who are on the autism spectrum. Mayzes testified that she visited the prospective foster home and found it to be safe and appropriate. Mayzes further testified that a transition plan was in place that provided for Z.J. to have contact with the prospective foster mother, including daily telephone calls and full-day in-person visits. Mayzes testified that the phone calls and visits had gone "very well." Z.J. told Mayzes that he "loves" his foster mother and was excited to be placed with her. The foster mother indicated that she intended to integrate Z.J. into her family "right away." While not specifically using the word "adoption," Mayzes told Z.J. that the foster mother "can potentially be his forever home." Mayzes indicated that Z.J. expressed excitement about the possibility. Mayzes testified that she was in the process of getting Z.J. "linked" to service providers in the foster family's neighborhood. The foster mother indicated that she had identified activities through the park district that would help Z.J. with "the social aspect."

¶ 41    According to Mayzes, no one else has come forth as willing and able to parent Z.J. when he is discharged from Cunningham. Mayzes noted that, while Z.J. does have adult siblings, her attempts to contact them had been unsuccessful. Moreover, Z.J. maintained contact with respondent but it was supervised because respondent had been inappropriate over the phone. For instance, respondent blamed the agencies for Z.J. being unable to return home, and she had told Z.J. that she will never see or speak to him again. When asked how Z.J. felt about having contact with respondent, Mayzes responded, "He's okay, but it's one of those things that, if talking to [respondent] is not on his daily plan, he doesn't talk to her. So as far as [respondent], sometimes they can go maybe like a few weeks without talking." Mayzes opined that it was in Z.J.'s best interests to terminate respondent's parental rights.

¶ 42    On cross-examination by respondent's attorney, Mayzes admitted that, throughout the bulk of the case, respondent did attempt to visit Z.J. She also acknowledged that she observed a bond between respondent and Z.J. during their visits. On cross-examination by the GAL, Mayzes testified that the last two visits occurred in October 2018 and May 2019. Mayzes testified that Z.J. did not talk about respondent unless he had a phone call with her on his schedule.

- 11 -

¶ 43    On redirect examination, Mayzes testified that respondent was in a relationship with Daniel. Mayzes testified that Z.J. came into care because Daniel "put two bruises about a quarter size on [Z.J.'s] chest because he refused to do his homework." Mayzes noted that Daniel had participated in some services. However, Z.J. did not feel safe around Daniel.

¶ 44    Following Mayzes's testimony, the trial court took judicial notice, without objection, of the evidence from the unfitness hearing as well as Mayzes's best-interest report. The court also took judicial notice of the CASA report filed that day. Respondent's attorney presented no evidence.

¶ 45    Following argument by the parties, the court determined that the State established by a preponderance of the evidence that it was in Z.J.'s best interests that respondent's parental rights be terminated. The court noted that Z.J. was quickly bonding with the prospective foster family and appeared excited about his prospective adoptive home. The court further noted that Z.J. and the foster mother spoke every day, which was "far more communication than goes on with [respondent] who continues to live and be married to [Daniel] who Z.J. does express fear [of]." On September 19, 2019, respondent filed a notice of appeal.

### III. ANALYSIS

¶ 47    The Juvenile Court Act of 1987 (Act) sets forth a bifurcated procedure for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2018). Under this procedure, the State must make a threshold showing of parental unfitness by clear and convincing evidence. 705 ILCS 405/2-29(2), (4) (West 2018); *In re J.L.*, 236 Ill. 2d 329, 337 (2010); *In re Adoption of Syck*, 138 Ill. 2d 255, 277 (1990); *In re Antwan L.*, 368 Ill. App. 3d 1119, 1123 (2006). If a court finds a parent unfit, the State must then show by a preponderance of the evidence that termination of parental rights would serve Z.J.'s best interests. *Syck*, 138 Ill. 2d at 277; *Antwan L.*, 368 Ill. App. 3d at 1123; *In re Tiffany M.*, 353 Ill. App. 3d 883, 891 (2004). In this case, respondent argues that the trial court's finding that she was unfit was against the manifest weight of the evidence, because "virtually all of the evidence offered by the state consisted of multi-level hearsay" for which the State laid "no proper foundation." Respondent further contends that the trial court erred in finding that it was in Z.J.'s best interests that her parental rights be terminated, again citing the alleged multilevel hearsay but also arguing that the remaining, admissible evidence was insufficient to sustain the State's burden of proof. Respondent also asserts that she was denied the effective assistance of counsel and that her due process rights were violated, because the trial judge who presided over the proceedings leading up to the filing of the motion for termination of parental rights also presided over both the unfitness and best interests phases of the termination hearing. We address each argument in turn.

### A. Unfitness

¶ 49    First, respondent argues that the State did not meet its burden of proving her unfit on any count because "virtually all of the evidence offered by the state consisted of multi-level hearsay" for which the State laid "no proper foundation." Specifically, respondent asserts that the only evidence on the issue of unfitness consisted of multiple levels of hearsay in the eight service plans admitted and the testimony of Mayzes. Respondent concedes that service plans are admissible at fitness hearings under the business records exception to the hearsay rule (see 705 ILCS 405/2-18(4)(a) (West 2018); *In re Kenneth J.*, 352 Ill. App. 3d 967, 983 (2004)), but

she asserts that the State here failed to lay a foundation for the exhibits and that Mayzes's testimony was based on descriptions of the contents of those reports. As such, respondent insists, the trial court's unfitness findings are against the manifest weight of the evidence and should be reversed.

¶ 50    We note first that the service plans were admitted at the termination hearing without objection by respondent and that she did not object to any aspect of Mayzes's testimony. Thus, we find that respondent has forfeited on appeal any argument regarding the admission of the service plans or Mayzes's testimony. See *In re N.T.*, 2015 IL App (1st) 142391, ¶ 41 ("Generally, an issue that was not objected to during trial *** is forfeited on appeal."); *In re Jaber W.*, 344 Ill. App. 3d 250, 256 (2003) (holding that the failure to object to the admissibility of evidence on hearsay grounds at trial results in waiver of argument on appeal); *In re April C.*, 326 Ill. App. 3d 225, 242 (2001) (noting that, where a party fails to make an appropriate objection in the court below, he or she fails to preserve the issue for review). Respondent acknowledges that she did not object to the admission of the service plans or Mayzes's testimony, but she requests that we consider this issue under the plain error doctrine.

¶ 51    Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." The plain error doctrine is a limited and narrow exception to the forfeiture rule. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). The doctrine allows a reviewing court to consider an unpreserved error where either (1) a clear or obvious error occurs and the evidence is so closely balanced that such error threatens to tip the scales of justice against the accused, regardless of the seriousness of the error or (2) a clear or obvious error occurs and the error is so serious that it affects the fairness of the trial and challenges the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Before we determine whether plain error occurred, however, we must first determine whether any error occurred at all. *People v. Sargent*, 239 Ill. 2d 166, 189 (2010). This requires a substantive review of the issues raised on appeal. *People v. Walker*, 232 Ill. 2d 113, 125 (2009). If clear or obvious error did not occur, no plain error analysis is necessary. *People v. Wright*, 2017 IL 119561, ¶ 87; *Walker*, 232 Ill. 2d at 124-25. In this case, we need not engage in a plain error analysis, as we find that no error occurred with respect to the admission of the service plans or Mayzes's testimony.

¶ 52                              1. Foundation for Service Plans

¶ 53    Respondent initially contends that, although service plans are generally admissible as business records pursuant to section 2-18(4)(a) of the Act (705 ILCS 405/2-18(4)(a) (West 2018)), the State failed to lay a proper foundation for the admission of the eight service plans at issue here.

¶ 54    Termination proceedings under the Act employ the general rules of civil practice and the provisions of the Code of Civil Procedure unless the Act specifically governs the procedure at issue. 705 ILCS 405/2-18(1) (West 2018); *In re S.J.*, 407 Ill. App. 3d 63, 69 (2011) (finding it proper to apply rules of evidence under the Act to a hearing involving the termination of parental rights); *In re A.B.*, 308 Ill. App. 3d 227, 234 (1999) (same). The Act specifically provides for the admission of business records into evidence if the statutory foundational requirements are satisfied. 705 ILCS 405/2-18(4)(a) (West 2018); *A.B.*, 308 Ill. App. 3d at 234-35. Specifically, section 2-18(4)(a) of the Act provides:

"(4)(a) Any writing, record, photograph or x-ray of any hospital or public or private agency, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a minor in an abuse, neglect or dependency proceeding, shall be admissible in evidence as proof of that condition, act, transaction, occurrence or event, if the court finds that the document was made in the regular course of the business of the hospital or agency and that it was in the regular course of such business to make it, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter. A certification by the head or responsible employee of the hospital or agency that the writing, record, photograph or x-ray is the full and complete record of the condition, act, transaction, occurrence or event and that it satisfies the conditions of this paragraph shall be *prima facie* evidence of the facts contained in such certification. A certification by someone other than the head of the hospital or agency shall be accompanied by a photocopy of a delegation of authority signed by both the head of the hospital or agency and by such other employee. All other circumstances of the making of the memorandum, record, photograph or x-ray, including lack of personal knowledge of the maker, may be proved to affect the weight to be accorded such evidence, but shall not affect its admissibility." 705 ILCS 405/2-18(4)(a) (West 2018).

"Business records are considered reliable, and thus admissible, because of the regular, prompt, and systematic manner in which they are kept and the fact that they are relied upon in the operation of the business." *A.B.*, 308 Ill. App. 3d at 235.

¶ 55 Respondent argues that the eight service plans here were not accompanied by a certification of either kind described in the statute. Our review of the record confirms this lack of certification, and the State does not assert otherwise. Absent certification, the State could satisfy the statute's foundational requirements by establishing that the writings were made (1) as a memorandum or record of the event, (2) in the regular course of business, and (3) at the time of the event or within a reasonable time thereafter. 705 ILCS 405/2-18(4)(a) (West 2018); *In re J.Y.*, 2011 IL App (3d) 100727, ¶ 13; *A.B.*, 308 Ill. App. 3d at 235. The author of the writing does not need to testify or be shown to be unavailable. *J.Y.*, 2011 IL App (3d) 100727, ¶ 13; *A.B.*, 308 Ill. App. 3d at 235. Instead, anyone familiar with the business and its procedures may testify about how the writing was prepared. *In re J.C.*, 2012 IL App (4th) 110861, ¶ 26; *J.Y.*, 2011 IL App (3d) 100727, ¶ 13; *A.B.*, 308 Ill. App. 3d at 235. We review the admission of evidence pursuant to section 2-18(4)(a) for an abuse of discretion. See *People v. Caffey*, 205 Ill. 2d 52, 89-90 (2001); *J.Y.*, 2011 IL App (3d) 100727, ¶ 13; *People v. Hall*, 314 Ill. App. 3d 688, 697-99 (2000). An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable or when no reasonable person would agree with the position taken by the trial court. *Control Solutions, LLC v. Elecsys*, 2014 IL App (2d) 120251, ¶ 38.

¶ 56 Respondent does not dispute that the service plans constituted memoranda or records of the events described therein or that the State elicited testimony that the service plans were made in the regular course of business of the agency that prepared them. According to respondent, however, the State did not ask, and Mayzes did not testify, whether the entries in the service plans were made "at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter." 705 ILCS 405/2-18(4)(a) (West 2018). Further, respondent insists that no dates are given from which it could be determined that the service plans were

made at or within a reasonable time after each act or occurrence. Respondent contends that the State's omission did not constitute just a minor defect, given that each service plan covered a period of six months to one year and that the eight service plans together covered a period of fifty-one months. Respondent argues that, because the service plans do not meet the foundational requirements of section 2-18(4)(a) of the Act, they should not have been admitted at trial. We disagree.

¶ 57 The eight service plans here were dated March 12, 2015, October 1, 2015, April 6, 2016, April 1, 2017, September 29, 2017, March 23, 2018, October 10, 2018, and March 25, 2019. Thus, except for the service plan dated April 1, 2017, a new service plan was prepared approximately every six months. Each service plan identified various tasks and task-related "action steps" for each participant to complete during the relevant review period. Each plan also listed establishment and evaluation dates for each task, start and evaluation dates for each "action step," an evaluation narrative for each task and "action step," and a summary of the family's progress since the last review.

¶ 58 Thus, for instance, the first service plan identified the following five tasks for respondent: (1) comply with agency recommendation, (2) participate in couple's counseling, (3) participate in educational groups for parents of children with autism or developmental delays, (4) participate in individual counseling, and (5) participate in parenting classes. The establishment and evaluation dates for the first task listed above were, respectively, October 17, 2014, and March 12, 2015. Similarly, each "action step" within the first task had a start date of October 17, 2014, and an evaluation date of March 12, 2015. The evaluation narrative for the first task provided that respondent had "been cooperative with the agency thus far" and "expressed a willingness to engage in services." The evaluation narrative for the "action steps" within the first task noted that the agency had no reason to suspect substance abuse by respondent, respondent had been cooperative with signing all necessary releases of information, respondent had been cooperative with all home visits, respondent had been cooperative with all agency recommendations, respondent had maintained communication with the caseworker, and referrals for parenting classes and counseling had been completed.

¶ 59 The establishment and evaluation dates for the first service plan's four remaining tasks were January 21, 2015, and March 12, 2015, respectively. Likewise, each "action step" within those tasks had a start date of January 21, 2015, and an evaluation date of March 12, 2015. The evaluation narrative for these tasks indicated that (1) the caseworker would refer respondent for couple's therapy once deemed clinically appropriate by respondent's individual therapist, (2) respondent expressed a willingness to engage in educational classes for children with autism and developmental delays, (3) a referral for individual counseling was being completed and respondent expressed a willingness to engage in individual counseling, and (4) respondent had begun parenting classes and was participating appropriately. The summary of the family's progress expounded upon the details in the evaluation narrative, specifying, for instance, that respondent began parenting classes in February 2015, with an estimated completion date of April 2015. The service plan also detailed respondent's and Z.J.'s visits and the family's housing and financial situations.

¶ 60 The second service plan identified the same five tasks for respondent and added a sixth task, family counseling. The family counseling task had a proposed establishment date of October 16, 2015, and each "action step" related thereto had the same proposed start date. The establishment date of each of the five remaining tasks and the start date of each "action step"

related to the remaining five tasks were the same as those in the first service plan. However, each task and associated "action step" had an evaluation date of October 1, 2015. The evaluation narratives for the various tasks noted that (1) respondent had been cooperative with the agency during the review period, (2) respondent had completed parenting classes, with no recommendations made, (3) respondent had begun individual counseling in June 2015, but she reported only feelings of helplessness related to agency involvement, (4) respondent had not participated in any educational groups for parents of children with autism and developmental delays, and (5) respondent began couple's counseling in September 2015, but the therapist recommended that she continue to work on individual counseling before continuing with couple's counseling. The summary of the family's progress since the last permanency review indicated that respondent completed parenting classes in April 2015 and began individual counseling in June 2015. The service plan also included an update on visits, housing, and financial stability.

¶ 61    We need not document the details of the remaining six service plans. Suffice it to say, each subsequent plan includes an evaluation of respondent's progress (or lack thereof) on each identified task and task-related "action step" since the plan preceding it. To be sure, the plans do not document the exact date of every task or "action step" set out therein. Nevertheless, each service plan clearly builds upon the previous plan by detailing the extent, if any, of respondent's participation in and progress on the tasks and "action steps" identified therein over the approximate six-month period preceding the date of the plan. This constitutes sufficient evidence from which it could be determined that the plans were made at or within a reasonable time after each act or occurrence recorded in the service plans. See *In re Nylani M.*, 2016 IL App (1st) 152262, ¶ 40 (finding that passage in letter specifying that the minor " 'has been showing a lot of aggressive behavior *lately*' " suggested that the described events occurred within a recent time period) (emphasis in original)); *Kenneth J.*, 352 Ill. App. 3d at 983 (finding that the requirements for admission of "Parenting Assessment Report" under section 18(4)(a) of the Act were satisfied where evidence at hearing showed that document was prepared in the regular course of the agency's business and the document "was clearly made contemporaneously with the events the Report recorded"); see also *A.B.*, 308 Ill. App. 3d at 235-36 (holding that service plans were properly admitted under section 18(4)(a) of the Act where each witness testified that the plans were prepared in the regular course of business and were made contemporaneously with the events they purported to record). Thus, we reject respondent's claim that the State failed to lay a foundation for admission of the service plans at the termination hearing, and we hold that their admission did not constitute an abuse of discretion.

¶ 62                                      2. Foundation for Mayzes's Testimony

¶ 63    Respondent next contends that the State failed to lay a proper foundation for Mayzes's testimony. In particular, respondent asserts that Mayzes testified primarily with respect to the services plans, including what services respondent did or did not complete, but that "no foundation was laid for her having personal knowledge that [*sic*] occurred with respect to [respondent's] services." As such, respondent contends that Mayzes's testimony, with the exception of that regarding her own conversations with respondent, should have been excluded as hearsay. As noted above, we review the admission of evidence for an abuse of discretion. See *Caffey*, 205 Ill. 2d at 89-90; *Hall*, 314 Ill. App. 3d at 697-99.

- 16 -

¶ 64         The only authority respondent cites in support of her position is *A.B.*, 308 Ill. App. 3d 227. In that case, the reviewing court held that allowing lengthy testimony regarding the contents of service plans by witnesses who did not prepare them constituted error because "[t]he witnesses had secondhand knowledge, at best, of the events that led to the conclusions contained in the service plans." *A.B.*, 308 Ill. App. 3d at 237. In other words, the court determined that it was improper for the trial court to allow the testimony because the witnesses did not author the documents. *A.B.*, 308 Ill. App. 3d at 237. That is not what happened in this case. Mayzes was the family's caseworker since December 2016, and she prepared the last five service plans. Much of the information in those five service plans was based on Mayzes's direct knowledge. As such, Mayzes could provide firsthand testimony of her interactions with respondent as well as respondent's progress or lack thereof with respect to the tasks she was assigned. Further, while the *A.B.* court held that it was error to allow the testimony about the service plans, it determined that the error did not constitute reversible error, because "client service plans alone, without the aid of the supporting testimony, are sufficient to establish at least one ground of parental unfitness by clear and convincing evidence." *A.B.*, 308 Ill. App. 3d at 237. Therefore, even if the trial court erred in admitting portions of Mayzes's testimony that were not based on her personal knowledge, the admission did not constitute error, as it was "mere surplusage." *A.B.*, 308 Ill. App. 3d at 237. Considering the foregoing, we conclude that the trial court did not abuse its discretion in allowing Mayzes to testify about the contents of the service plans.

¶ 65                                      3. Multilevel Hearsay

¶ 66         Next, respondent contends that the eight service plans here contain "multilevel hearsay," *i.e.*, hearsay within hearsay. As noted previously, respondent does not dispute that the exhibits themselves were admissible pursuant to section 2-18(4)(a) of the Act (705 ILCS 405/2-18(4)(a) (West 2018)) if the statute's foundational requirements were satisfied. She contends, however, that "second, third, and fourth hand hearsay" is not transformed into admissible evidence merely because it appears in an otherwise admissible report. She argues that another hearsay exception must apply to the hearsay statements in the services plans before they may be admitted. To this end, respondent cites Illinois Rule of Evidence 805 (eff. Jan. 1, 2011), which provides that "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." She also directs us to *People v. McCullough*, 2015 IL App (2d) 121364, ¶ 113, stands for the proposition that "multilevel hearsay is not admissible unless each layer of hearsay is excused by its own exception." Respondent maintains that "section 405/2-18(4)(b) [*sic*], properly read, is consistent with this strong public policy in restricting the admission of hearsay" and requires the State "to show that each item of multilevel hearsay within an admitted report meets the same foundational requirements as a business record as the document itself." Respondent contends that the State failed to comply with this process and that therefore any multilevel hearsay within the service plans was improperly admitted. We disagree.

¶ 67         As noted above, section 2-18(4)(a) of the Act provides in relevant part as follows:

        "Any writing, record, photograph or x-ray of any hospital or public or private agency, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a minor in an abuse, neglect or dependency proceeding, shall be admissible in evidence as proof

of that condition, act, transaction, occurrence or event, if the court finds that the document was made in the regular course of the business of the hospital or agency and that it was in the regular course of such business to make it, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter. \*\*\* *All other circumstances of the making of the memorandum, record, photograph or x-ray, including lack of personal knowledge of the maker, may be proved to affect the weight to be accorded such evidence, but shall not affect its admissibility*." (Emphasis added.) 705 ILCS 405/2-18(4)(a) (West 2018).

In light of this language, respondent's multilevel hearsay objection is not well founded. Quite simply, the lack of knowledge of the maker of the documents at issue is, in accordance with the statute, a matter of weight rather than admissibility. 705 ILCS 405/2-18(4)(a) (West 2018). Indeed, as noted above, the legislature deemed it proper to admit DCFS records and the information contained therein, as long as the information was made of record in the regular course of the agency's business and at the time of the event or within a reasonable time thereafter. It is only logical that such records are admissible and may be considered, because assessing a parent's compliance with service plans is included in a determination of whether the parent has made reasonable progress or has maintained a reasonable degree of interests, concern, or responsibility as to a minor's welfare. *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001) (reasonable progress); *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31 (reasonable degree of interest, concern, or responsibility). Thus, the trial court here properly could consider the service plans and attribute to them whatever weight they were due, taking into account their hearsay nature.

¶ 68 Respondent insists that an opposite conclusion is dictated by two recent cases, *In re Zariyah A.*, 2017 IL App (1st) 170971, and *In re G.V.*, 2018 IL App (3d) 180272. In *Zariyah*, 2017 IL App (1st) 170971, ¶ 86, the respondent argued that the trial court erred "by admitting and relying on hearsay evidence concerning the results of her mental health \*\*\* assessments." The alleged hearsay consisted of testimony from the respondent's caseworker that the respondent suffered from bipolar disorder. The GAL responded that the admission of the caseworker's testimony was, at most, harmless error because the respondent's mental health status was mentioned in two reports prepared by the caseworker and the reports were properly admitted as business records under section 2-18(4)(a) of the Act. The reviewing court disagreed, stating, "even if we agree that the foundational requirements of \*\*\* section [2-18(4)(a)] were met, that argument could only address the first layer of hearsay—the document itself." *Zariyah A.*, 2017 IL App (1st) 170971, ¶ 93. Respondent's reliance on *Zariyah A.* is misplaced, however, as that court did not reference, much less discuss, the language in section 2-18(4)(a) that the lack of knowledge of the maker is a matter of weight rather than admissibility. Respondent contends that the court in *G.V.* concluded that "double and triple hearsay in a DCFS report could not be deemed admissible simply by characterizing it as an indicated report." See *G.V.*, 2018 IL App (3d) 180272, ¶ 32. Respondent's reliance on this authority is also misplaced because the *G.V.* court did not reference section 2-18(4)(a) at all.

¶ 69 Respondent also insists that the language in section 2-18(4)(a) regarding the weight to be accorded documentary evidence "does not mean that any manner of third and fourth level hearsay in the document should be considered as admissible once the document is determined to be a business record." Rather, he asserts, the language "simply means that the \*\*\* employee who observed the act, transaction, occurrence or event need not be the same as the employee

who created the record." However, respondent does not cite any authority in support of this narrow interpretation of the language. Indeed, respondent's interpretation ignores the plain language of the statute, which clearly specifies that, once a foundation is properly laid, *all other circumstances* surrounding the making of the document affect the weight to be accorded the evidence, but do not affect its admissibility. See *In re Jose A.*, 2018 IL App (2d) 180170, ¶ 18 (noting that the language of a statute should be given its plain and ordinary meaning). Thus, respondent's position is not well taken.

¶ 70   Respondent also suggests that, because section 2-18(4)(a) provides that "acts or occurrences appearing in the record 'shall be admissible in evidence as proof of *that* condition, act, transaction, occurrence or event' " (emphasis supplied by respondent), the state "has to show that each item of multilevel hearsay within an admitted report meets the same foundational requirements as a business record as the document itself." However, nothing in the passage respondent cites alters the language stating that the maker's lack of personal knowledge constitutes a matter of weight.

¶ 71   Respondent also cites case law reflecting that wholesale judicial notice of all documents or events that occurred prior to an unfitness hearing is "unnecessary and inappropriate." *In re J.G.*, 298 Ill. App. 3d 617, 629 (1998). However, the court here did not take judicial notice of the service plans. Rather, it admitted the reports into evidence without objection by respondent.

¶ 72   For the reasons set forth above, we reject respondent's argument that the multilevel hearsay within the eight service plans was inadmissible and hold that the trial court was entitled to consider the exhibits and attribute to them whatever weight they were due, taking into account their hearsay nature. Respondent challenges the unfitness findings only on the ground that virtually all of the State's evidence consisted of the multilevel hearsay present in the service plans and Mayzes's testimony, for which the State failed to lay a proper foundation. Having rejected the premises underlying respondent's argument, we cannot agree that the trial court's unfitness findings are against the manifest weight of the evidence. Hence, we affirm the trial court's findings that, on all three grounds alleged in the State's petition, respondent was unfit to parent Z.J.

¶ 73                                    B. Best Interests

¶ 74   Next, respondent challenges the trial court's finding that it was in Z.J.'s best interests to terminate respondent's parental rights. As noted earlier, once a trial court finds a parent unfit, it must determine whether termination of parental rights is in Z.J.'s best interests. *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 41. As our supreme court has noted, at the best-interests phase, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The State bears the burden of proving by a preponderance of the evidence that termination is in the best interests of a minor. *D.T.*, 212 Ill. 2d at 366; *In re Deandre D.*, 405 Ill. App. 3d 945, 953 (2010). Section 1-3(4.05) of the Act (705 ILCS 405/1-3(4.05) (West 2018)) sets forth various factors for the trial court to consider in assessing a minor's best interests. These considerations include (1) the minor's physical safety and welfare; (2) the development of the minor's identity; (3) the minor's familial, cultural, and religious background; (4) the minor's sense of attachment, including love, security, familiarity, and continuity of relationships with parental figures; (5) the minor's wishes and goals; (6) community ties; (7) the minor's need for permanence; (8) the uniqueness of every family and every child; (9) the risks related to substitute care; and

(10) preferences of the person available to care for the child. 705 ILCS 405/1-3(4.05) (West 2018). The trial court need not explicitly reference each best-interests factor in rendering its decision. *In re Jaron Z.*, 348 Ill. App. 3d 239, 262-63 (2004). We review the trial court's best-interests finding under the manifest-weight-of-the-evidence standard. *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 41.

¶ 75 Here, the record supports the trial court's finding that termination of respondent's parental rights was in Z.J.'s best interests. Z.J. is a 14-year-old minor with multiple mental health issues. The record shows that Z.J. was bonding with the prospective foster mother, was excited about his prospective adoptive home, spoke with the prospective foster mother daily, and had begun in-person visits with her. Moreover, the prospective foster mother had been fostering children for more than 25 years, had worked extensively with children on the autism spectrum, intended to quickly integrate Z.J. into her family, and had identified activities for him. Mayzes testified that she visited the prospective foster home and that it offered a safe and appropriate living environment for Z.J. While there is undoubtedly a bond between respondent and Z.J., the evidence presented at the best interests hearing demonstrated that respondent did not maintain regular contact with Z.J. and that the contact she did maintain was supervised because respondent's conduct had been inappropriate. Moreover, Z.J. had expressed fear of Daniel. Given this record, we cannot say that the trial court's finding that it was in Z.J.'s best interests to terminate respondent's parental rights was against the manifest weight of the evidence.

¶ 76 Respondent complains of the hearsay nature of some of the evidence, specifically, contending that, by taking judicial notice of the evidence presented at the unfitness phase of the hearing, the trial court relied on "the same inadmissible evidence offered on fitness." However, respondent has forfeited this argument by failing to object to this evidence at trial. See *Jaber W.*, 344 Ill. App. 3d at 256; *April C.*, 326 Ill. App. 3d at 242. Anticipating a finding of forfeiture, respondent requests that we review this issue under the plain error doctrine. Nonetheless, we find no error, much less plain error, and we conclude that respondent's argument lacks merit for the reasons set forth in the preceding section. We also observe that the formal rules of evidence do not apply at the best interests phase of termination proceedings. *In re Jay H.*, 395 Ill. App. 3d 1063, 1070 (2009). Rather, at the best interests phase, the trial court may rely on "[a]ll evidence helpful [(in the trial court's judgment)] in determining these questions" to the extent of its probative value. 705 ILCS 405/2-22(1) (West 2018); *Jay H.*, 395 Ill. App. 3d at 1070. Hence, to the extent that the trial court considered the evidence presented at the unfitness hearing, it was proper to do so, because such evidence was probative of the best interests factors. *Jay H.*, 395 Ill. App. 3d at 1070. We find no error.

¶ 77 C. Ineffective Assistance of Counsel

¶ 78 Next, respondent argues that trial counsel was ineffective for failing to object to the admission of the eight service plans and Mayzes's testimony, on the bases of lack of foundation and hearsay. Respondent also faults trial counsel for failing to object to "the trial court's basing its decision on fitness on the court's prior rulings at a permanency hearing regarding [respondent's] efforts and progress."

¶ 79 Although there is no constitutional right to counsel in proceedings pursuant to the Act, a parent has a statutory right to counsel in a proceeding to terminate his or her parental rights. 705 ILCS 405/1-5(1) (West 2018); *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 41. To adjudicate a parent's claim that he or she received ineffective assistance of counsel in such a proceeding,

we apply the dual-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Ca. B.*, 2019 IL App (1st) 181024, ¶ 42. Thus, to prevail on a claim of ineffective assistance of counsel, a parent must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) a reasonable probability exists that, but for the error, the result of the proceeding would have been different. *Ca. B.*, 2019 IL App (1st) 181024, ¶ 42 (citing *Strickland*, 466 U.S. at 687-88, 694). *Strickland* requires a showing of actual prejudice, not mere speculation as to prejudice. *People v. Bew*, 228 Ill. 2d 122, 135 (2008). Moreover, both prongs of the *Strickland* test must be satisfied. *Ca. B.*, 2019 IL App (1st) 181024, ¶ 42. Hence, the failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *Ca. B.*, 2019 IL App (1st) 181024, ¶ 42. With these principles in mind, we address respondent's claim.

¶ 80    We reject respondent's arguments concerning trial counsel's failure to object to the admission of the evidence at issue. As previously discussed, although the failure to object did contribute to forfeiture of those arguments on appeal, the evidence either was properly admitted under the Act or did not result in prejudice. Hence, the failure to object was not objectively unreasonable, as any objection would not have been successful. See *People v. Wilson*, 164 Ill. 2d 436, 454 (1994) (failing to interpose a futile objection is not ineffectiveness); *People v. Holmes*, 397 Ill. App. 3d 737, 745 (2010) (same).

¶ 81    Respondent also maintains that trial counsel was ineffective for failing to object to "the trial court's basing its decision on fitness on the court's prior rulings at a permanency hearing regarding [respondent's] efforts and progress." In finding respondent unfit, the court remarked in part as follows:

> "And the—certainly, the order of [the permanency review hearing on] December 11th of 2018 [*sic*], which I have taken judicial notice of, which found that mother had not made reasonable efforts or progress was a judicial finding to that effect. So she clearly was not meeting the goals that she needed to meet in order to go toward reunification. And that's why the Court changed the goal, because reunification appeared at that point to be a very slim possibility."

Respondent contends that a finding at a permanency review hearing is not relevant to an unfitness determination because the state's burden of proof at such a hearing is clear and convincing evidence whereas there is no burden of proof at a permanency hearing. Thus, he suggests, trial counsel should have objected to the court's ruling. Respondent, however, does not indicate when trial counsel could have raised an objection. For instance, respondent does not suggest that it would have been appropriate for trial counsel to interrupt the court mid-ruling to challenge the court's rationale. Indeed, it seems to us that it would have been more appropriate to challenge the trial court's rationale on direct appeal. In any event, we note that, since the grounds for finding unfitness are independent, a reviewing court may affirm an assessment of parental unfitness if the evidence supports it on any one of the grounds alleged. *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 30. Our reading of the record in this case indicates that the trial court's comments were in reference to its findings that respondent failed to make reasonable efforts or reasonable progress, not to its finding that respondent failed to show a reasonable degree of responsibility as to Z.J.'s welfare. Thus, even if trial counsel's failure to object to the trial court's remarks fell below an objective standard of reasonableness, respondent has failed to show a reasonable probability that the result of the proceeding would have been different. For all the foregoing reasons, we hold that respondent failed to establish

that trial counsel was ineffective.

¶ 82                                    D. Judicial Bias

¶ 83    Finally, respondent argues that she was denied due process, because the judge who presided over both the unfitness and best interests phases of the termination hearing also presided over the proceedings leading up to the filing of the motion to terminate. Respondent contends that, by the time of the fitness hearing, the judge had presided over years of hearings and reviewed hundreds of pages of multilevel hearsay. Respondent suggests that judges often make rulings at permanency review hearings based entirely on inadmissible evidence. Respondent reasons that

> "[o]nce a judge has ordered a change from return home to termination of parental rights, it is difficult to see how that judge can then forget the often years of conferences and proceedings, and hundreds of pages of reports, on which he [or she] based that goal change, despite his [or her] best attempts to do so."

Respondent urges this court to adopt a rule that the judge presiding over termination proceedings should not be the judge who has presided over the hearings leading up to those proceedings when that judge has ordered a change of the permanency goal to termination of parental rights.

¶ 84    Respondent's appellate counsel concedes that he has "found no case on point, the closest being" the concurrence of Justice Steigmann in *In re A.T.*, 197 Ill. App. 3d 821 (1990). There, Justice Steigmann wrote:

> "If neither DCFS nor the appropriate State's Attorney's office acts promptly to seek to terminate parental rights when that action is called for, then, as a last resort, the trial court must alert these agencies to the need to do so. *** I seriously doubt that it would ever need to take the extraordinary (and probably unwise) step of *directing* the State's Attorney to file a petition to terminate parental rights, assuming that the court even had the authority to do so under section 2-13(1) of the *** Act *** (Ill. Rev. Stat. 1987, ch. 37, par. 802-13(1)). Of course, when a judge has indicated there is a need for a petition to terminate parental rights to be filed, that judge must thereafter recuse himself or herself from any proceedings on that petition once it is filed." (Emphasis in original.) *A.T.*, 197 Ill. App. 3d at 835 (Steigmann, J., specially concurring).

Respondent focuses on the last sentence, attempting to analogize it to a trial court changing the goal from return home to substitute care pending a court determination on termination of parental rights. However, the situation referenced by Justice Steigmann in *A.T.* is not what happened here. Justice Steigmann was contemplating *sua sponte* action by a trial court. In this case, although a legal screen by DCFS had not been completed prior to the trial court's decision to change the permanency goal, the trial court did so in response to a request by the State (to which the GAL concurred) that it do so. In the former circumstances, the trial judge is essentially acting as an advocate for the minor. In the latter, the judge retains his or her neutral role and passes upon a party's request. Respondent's reliance on Justice Steigmann's special concurrence in *A.T.* is of limited relevance here.

¶ 85    Moreover, although our research has not identified any case directly on point, the authority that does exist does not favor respondent's position. For instance, a trial judge is presumed to consider only admissible evidence and disregard inadmissible evidence. *People v. Naylor*, 229

Ill. 2d 584, 603 (2008). This presumption is rebutted only "if it affirmatively appears from the record that improver evidence was considered by the court." *People v. Dobbs*, 353 Ill. App. 3d 817, 824 (2004). Further, Illinois Supreme Court Rule 903 (eff. March 8, 2016) provides that "[w]henever possible and appropriate, all child custody and allocation of parental responsibilities proceedings relating to an individual child shall be conducted by a single judge." Thus, our supreme court has expressed a preference for the same judge to hear all proceedings involving child custody and the division of parental responsibilities. Indeed, this is similar to the supreme court's proclamation in the criminal context that "the same judge who presided over the defendant's trial should hear his post-conviction petition, unless it is shown that the defendant would be substantially prejudiced." *People v. Hall*, 157 Ill. 2d 324, 331 (1993). The *per se* rule advocated by respondent would be contrary to the supreme court's admonition that "[t]o conclude that a judge is disqualified because of prejudice is not, of course, a judgment to be lightly made." *People v. Vance*, 76 Ill. 2d 171, 179 (1979). We decline to announce such a rule based only on a special concurrence that is only somewhat analogous.

¶ 86                                    IV. CONCLUSION

¶ 87        For the reasons set forth above, we affirm the judgment of the circuit court of Winnebago County, finding that respondent was an unfit parent and that it was in Z.J.'s best interest to terminate her parental rights.

¶ 88        Affirmed.