NOTICE

Decision filed 09/28/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 210121-U

NO. 5-21-0121

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* E.A., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Bond County. |
| | ) | |
| Petitioner-Appellee, | ) | No. 19-JA-18 |
| | ) | |
| v. | ) | |
| | ) | |
| Jesse A., | ) | Honorable |
| | ) | Martin J. Mengarelli, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's determinations that the minor's father was an unfit parent and that termination of his parental rights was in the minor's best interest were not against the manifest weight of the evidence.

¶ 2    Respondent, Jesse A., appeals from the judgment of the circuit court of Bond County finding he was an unfit parent and terminating his parental rights to his daughter, E.A. For the following reasons, we affirm.

1

¶ 3                          I. BACKGROUND

¶ 4    E.A. is the biological child of Jesse A. (Father) and Brandy H. (Mother), who is not a party to this appeal. E.A. was born on June 4, 2015. On June 7, 2018, the Illinois Department of Children and Family Services (DCFS) was contacted after E.A. was found wandering naked and alone in her neighborhood while she was in Mother's care. Following an investigation by DCFS, Mother was indicated[1] for inadequate supervision of E.A. and an intact family case[2] was opened. On January 28, 2019, Father went to Mother's home and found that the home was infested with roaches and cluttered with garbage, spoiled food, dirty dishes, and dirty clothes. When Father attempted to take E.A. out of the home, Mother struck him in the head with a hairbrush. After DCFS investigated that incident, Mother was indicated for substantial risk of physical injury and/or an environment injurious to the health and welfare of E.A. by neglect, environmental neglect, and inadequate supervision.

¶ 5    On October 20, 2019, DCFS was again contacted after E.A. was found wandering, naked and alone, two blocks from Father's home. DCFS also received information that Father was battling an addiction to methamphetamines. Following an investigation by DCFS, Father was indicated for inadequate supervision for leaving E.A. alone at home,

---

[1]When DCFS indicates a person for child abuse or neglect this means that a DCFS investigator conducted an investigation and determined that there was credible evidence that a child was abused or neglected. 89 Ill. Adm. Code 336.20 (2017).

[2]DCFS provides "intact family" services to families when credible evidence of abuse or neglect has been found, but the children are not removed from the home. *In re Tyrese J*., 376 Ill. App. 3d 689, 690 (2007).

outside or in the community, and for substantial risk of physical injury and/or an environment injurious to the health and welfare of E.A. by neglect.

¶ 6    On October 22, 2019, the State filed a petition for adjudication of wardship of the minor. The petition included several counts of neglect against Father and Mother pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West Supp. 2019)). The State alleged that E.A.'s environment was injurious to her welfare in that there were ongoing concerns about Father's ability or unwillingness to protect the minor, his drug use, and his ability to care for the minor. Similar allegations were brought against Mother. The State also alleged neglect based on an open intact case involving Father and Mother, claiming that both parents failed to follow through with substance abuse assessments and failed to meet the minimum parenting standards required by DCFS. In addition, the State alleged that E.A. was abused, as defined in section 2-3(2)(ii) of the Juvenile Court Act (705 ILCS 405/2-3(2)(ii) (West Supp. 2019)), in that Father was unable or unwilling to make viable parenting decisions and created a substantial risk of physical or emotional harm, when, on more than one occasion, E.A. was found, wandering naked and alone, two blocks away Father's home, while she was in Father's care.

¶ 7    During a hearing on October 22, 2019, Father and Mother stipulated to a temporary custody order placing E.A. in the temporary custody of DCFS. The trial court entered the order and appointed a guardian *ad litem* for the minor. Pursuant to an oral motion by the State, the court also entered orders directing Father and Mother to submit to random drug

3

testing. On that same date, Father tested positive for benzodiazepines, methamphetamines, amphetamines, and THC.

¶ 8     Following that hearing, Erin Schaub, the DCFS caseworker assigned to E.A.'s case, conducted an integrated assessment of Father and Mother to determine what services might be needed to correct the conditions that led to E.A.'s removal from the home. On December 6, 2019, service plans for both Father and Mother were filed with the court. In Father's service plan, Schaub recommended that Father obtain a substance abuse and mental health assessment and complete the recommended treatment. She also recommended that Father obtain steady employment and establish safe and appropriate housing.

¶ 9     On December 10, 2019, the trial court held an adjudicatory hearing. Father failed to appear for the hearing, and he was held in default. The court entered an order finding that E.A. was neglected as defined in section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West Supp. 2019)), and that E.A. was at substantial risk for physical abuse as defined in section 2-3(2)(ii) of the Juvenile Court Act (705 ILCS 405/2-3(2)(ii) (West Supp. 2019)). The court's findings were based on each parent's issues with substance abuse and inadequate supervision of the minor. A disposition hearing was scheduled for January 3, 2020.

¶ 10     On December 30, 2019, in anticipation of the disposition hearing, Schaub filed a case summary report. In the report, Schaub stated that E.A. had been placed with fictive kin[3] and that E.A. felt comfortable with and demonstrated an attachment to the foster

---

[3]Fictive kin refers to individuals who are not related by either birth or marriage but have an emotionally significant relationship with that individual that would take on the characteristics of a family relationship. *In re Z.J.*,

4

parents. The report also included information about E.A.'s medical issues. E.A. had been diagnosed with a severe and rare form of congenital epilepsy called Dravet syndrome. Because of this condition, E.A. was required to attend medical appointments frequently and take medication daily. E.A. also required speech therapy and occupational therapy. E.A.'s foster parents ensured that E.A. had the healthcare she needed, and they monitored her for seizures. Although E.A.'s foster parents resided outside of E.A.'s school district, E.A. was allowed to remain in her same school where she had an Individualized Education Program (IEP) in place due to her medical conditions.

¶ 11    Schaub's report also included information on the progress made by both parents on their service plans. At that time, Father had been referred to a counseling center for substance abuse treatment on an outpatient basis, and it was anticipated that the same counseling center would provide Father with mental health services. Because Father was on probation for domestic battery charges,[4] he was also referred for domestic violence treatment. Father had been living with friends, and the home did not present any safety concerns. Both parents had been participating in weekly supervised visitation with E.A.

¶ 12    On January 3, 2020, Father and Mother appeared for a disposition hearing. The trial court found that both parents were unfit, unable, and unwilling to care for, protect, train, educate, supervise, and discipline E.A. The court also found that the service plan and the

---

2020 IL App (2d) 190824, ¶ 24. In this case, Father referred to the fictive kin as his aunt and uncle, but he was not biologically related to the individuals.

[4]According to the report filed by DCFS on December 30, 2019, after creating the initial service plan, DCFS discovered that Father was on probation for domestic battery/bodily harm towards a former girlfriend. He had a previous conviction for assault and was recommended for domestic violence perpetrator services.

5

permanency goal of returning E.A. home within 12 months were appropriate. The court granted the State's petition for adjudication of wardship and ordered that custody of E.A. remain with DCFS. The court further ordered DCFS to supervise each parent's visits with E.A. A permanency review hearing was scheduled for March 20, 2020. On the same day as the disposition hearing, Father and Mother took drug tests and both tested positive for THC.

¶ 13    On March 9, 2020, Schaub filed a case summary report regarding the progress made by both parents. Schaub reported that she was unable to schedule additional drug testing for Father because he did not provide his work schedule to her. Schaub noted that Father completed a substance abuse and mental health assessment on December 31, 2019, but that, thereafter, he failed to engage in recommended services for his substance abuse and mental health issues. Father also completed an assessment for domestic violence treatment, but he was discharged from the program after three unexcused absences. Father's housing was a concern because he did not provide the name of his friend that he had stayed with and could not provide an address. On March 18, 2020, the court issued a notice indicating that the March permanency review hearing had been continued.

¶ 14    On July 24, 2020, the trial court held a permanency review hearing and both parents were present. The trial court found that neither parent had made reasonable efforts or progress on their service plans, but the court did not change the goal for E.A. to return home in 12 months. Both parents were admonished that they needed to work on their service plans.

¶ 15    On November 13, 2020, the trial court held another permanency review hearing. At that time, Father was incarcerated due to a probation violation. Father's attorney stipulated that Father had not made reasonable efforts or progress on his service plan. Father had not engaged in any services, except visitation with E.A. During the hearing, Schaub reported that E.A. was doing well in her placement and at school, and that E.A. was receiving necessary services. Another permanency hearing was scheduled for March 12, 2021.

¶ 16    On March 2, 2021, the State filed a motion to terminate the parental rights of both parents. The State alleged that Father and Mother were unfit under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)), asserting that each parent failed to make (a) reasonable efforts toward the return of the minor within the nine-month period after the December 10, 2019, adjudication of neglect, and (b) reasonable progress toward the return of the minor within the nine-month period after the December 10, 2019, adjudication of neglect.

¶ 17    On March 12, 2021, a permanency review hearing was held and both parents appeared. The trial court found that neither parent had made reasonable efforts or reasonable progress on their service plans. The court changed the permanency goal to substitute care pending termination of parental rights. A termination of parental rights hearing was scheduled for April 9, 2021.

¶ 18    On April 9, 2021, at the start of the termination hearing, Mother stated that she wanted to execute a directed consent to surrender her parental rights to the foster parents. Mother voluntarily surrendered her parental rights, and the voluntary surrender was accepted by the trial court. Mother was removed as a party to the proceeding.

7

¶ 19    Directly after Mother surrendered her rights, the trial court held a fitness hearing for Father. The State called Erin Schaub as its only witness. Schaub had been the family's caseworker since the inception of the case in October 2019. Schaub testified that E.A. came into the care of DCFS after she was found alone in the street when she should have been in the care of Father. Schaub noted that E.A. had developmental and other special needs, having been diagnosed with Dravet syndrome. Schaub testified that she completed an integrated assessment at the beginning of the case to identify service needs for Father. Based upon the assessment, Schaub recommended that Father complete substance abuse treatment, mental health treatment, and domestic violence treatment. Father was also tasked with the responsibility of finding stable housing.

¶ 20    Schaub testified that during the nine-month period from December 2019 through September 2020, Father obtained the recommended substance abuse and mental health assessments, but he did not engage in the substance abuse and mental health treatment programs recommended for him. Schaub stated that Father tested positive for THC and methamphetamines in December 2019, and that he admitted that he had been using drugs during the period from December 2019 through September 2020. Schaub stated that Father completed the domestic violence assessment, and a treatment program was recommended. Father attended only two sessions of the program and he was unsuccessfully discharged due to multiple absences. Father was rated unsatisfactory by DCFS in all three services he was required to complete. Schaub also testified that Father did not obtain stable housing. Father was living with friends in Greenville, then moved to Carlyle, but he did not know the name of the person he was living with and refused to provide an address. Father had,

ostensibly, lived with a girlfriend, who eventually filed an order of protection against him. Father admitted that he also slept outside a few times because he had nowhere else to stay. At the time of the hearing, he was living with friends in Mulberry Grove. DCFS rated his housing as unsatisfactory.

¶ 21    Schaub acknowledged that the coronavirus pandemic affected service delivery, but stated, based upon her experience, that services were easier to engage in because providers offered videoconference counseling appointments or phone sessions. Schaub testified that Father had a phone that he could use to access those services. Schaub believed that housing was more difficult to obtain due to the coronavirus because the moratorium on evictions resulted in less movement in rental housing. She noted that Father had been steadily employed during the coronavirus pandemic.

¶ 22    Father did not testify or present any evidence during the fitness hearing. At the close of the testimony, the trial court determined that the State proved by clear and convincing evidence that Father was an unfit person under the Adoption Act (750 ILCS 50/1(D)(m) (West 2020)). The unfitness determination was based on the court's findings that Father failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor from him within nine months after the adjudication of neglect, and that Father failed to make reasonable progress toward the return of the minor to him within nine months after the adjudication of neglect.

¶ 23    Immediately after the fitness hearing, the trial court proceeded to the best interest hearing. During the best interest hearing, Schaub testified that E.A. had bonded with her foster parents. Schaub stated that E.A. felt comfortable at the home of the foster parents,

and that it was a nurturing environment. She noted that E.A. was familiar with the foster parents because she and Father had lived with them in the past. Schaub also testified that the foster parents addressed E.A.'s special needs, noting that they took her to medical appointments, made sure she took her medicine, and attended IEP meetings at her school. E.A. was also receiving speech therapy, physical therapy, and occupational therapy, and her foster parents encouraged her development. Schaub stated that E.A. had connected with her two "big sisters," and that she enjoyed spending time doing outdoor activities with the foster family. According to Schaub, the foster parents had a bond with E.A. and were willing to adopt her.

¶ 24    Schaub testified that Father also had a bond with E.A. Schaub acknowledged that Father began engaging in substance abuse, mental health, and domestic violence services after March 2021, but he was still inconsistent in complying with the service plan. Schaub believed that Father was trying to rectify his behavior and change his earlier decisions not to participate in services.

¶ 25    Father testified during the best interest hearing. He stated that he loved E.A. and that his rights should not be terminated because he had improved his life since October 2019. Father explained the benefits of the services he had received through his service plan, and he believed his mental health was improving. He testified that therapy had taught him to hold himself accountable and be responsible. Father did not feel like he was a violent person. After participating in seven to nine domestic violence group meetings, he understood that corporal punishment was not appropriate. He learned methods of discipline and praise. Father testified that he had worked on becoming more stable, and that he

10

obtained his driver's license, purchased a car, maintained full-time employed, and had lived in the same house for six months.

¶ 26    Father acknowledged that initially, he was not ready "to get with the program," and that he had not engaged in recommended services until recently, when he decided to change his life. Father admitted that he tested positive for THC in March of 2021, and that he used methamphetamines twice since a positive drug test in December of 2020. He also admitted that he was resentenced and placed on probation in March 2021, for possession of methamphetamines, violating an order of protection, and domestic battery. At the time of the hearing, Father lived with a roommate that had "lost her kids to DCFS," but he intended to move to a small apartment with E.A. at some point in the future.

¶ 27    The guardian *ad litem* (GAL) recommended to the court that it would be in the child's best interest to terminate parental rights in accordance with the State's petition. The GAL based his recommendation on the statutory factor of the minor's need for permanence; he believed that the foster family would provide E.A. with the earliest opportunity for permanency.

¶ 28    On April 9, 2021, the trial court entered a written order terminating Father's parental rights. The court determined that the State proved by clear and convincing evidence that Father was an unfit person under the Adoption Act (750 ILCS 50/1(D)(m) (West 2020)), finding that he failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor within nine months after the adjudication of neglect, and that he failed to make reasonable progress toward the return of the minor within nine months after the adjudication of neglect. The court also found that it was in the best interest

11

of the minor that Father's parental rights be terminated and that DCFS be appointed as the minor's guardian with the power to consent to adoption. Father appealed.

¶ 29                                    II. ANALYSIS

¶ 30    On appeal, Father claims that the trial court erred in terminating his parental rights. He argues that the court's determinations that he was unfit, and that termination of his parental rights was in the best interests of E.A. were against the manifest weight of the evidence.

¶ 31    A parent's right to raise his or her child is a fundamental liberty interest and terminating parental rights is a drastic measure. *In re Haley D.*, 2011 IL 110886, ¶ 90. The authority to involuntarily terminate parental rights is found in the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). *In re J.L.*, 236 Ill. 2d 329, 337 (2010). Section 2-29 of the Juvenile Court Act provides a two-step process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). First, the trial court must find, based upon clear and convincing evidence, that the parent is an unfit person as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re J.L.*, 236 Ill. 2d at 337. If the trial court finds a parent to be unfit, then the court next determines whether the State has proven, by a preponderance of the evidence, that it is in the child's best interest to terminate parental rights. *In re J.H.*, 2020 IL App (4th) 200150, ¶ 67.

¶ 32                          A. Determination of Unfitness

¶ 33    A determination of unfitness involves factual findings and credibility assessments which are accorded great deference by a reviewing court, and the trial court's factual

12

findings will not be reversed unless they are against the manifest weight of the evidence. *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000). A determination is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, and not based on the evidence presented. *In re M.J.*, 314 Ill. App. 3d at 655. In determining whether a parent is unfit under subsections 1(D)(m)(i) or (ii) of the Adoption Act, the trial court considers evidence of the parent's conduct in any nine-month period[5] following the adjudication of neglect, abuse, or dependency. 750 ILCS 50/1(D)(m)(i), (ii) (West 2020); *In re R.L.*, 352 Ill. App. 3d 985, 999 (2004).

¶ 34    In this case, the trial court concluded that the State had proven that Father was unfit because (a) he failed to make reasonable efforts to correct the conditions that led to the child's removal during the nine-month period after the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2020)), and (b) he failed to make reasonable progress toward the child's return home during the nine-month period after the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2020)). The failure to make reasonable efforts to correct the conditions that led to the child's removal and the failure to make reasonable progress toward the return of the child are distinct grounds for a finding of parental unfitness and each ground requires a separate analysis. *In re R.L.*, 352 Ill. App. 3d at 998. However, only one ground of unfitness needs to be proven in order to find a parent unfit. *In re R.L.*, 352 Ill. App. 3d at 998.

---

[5]When a petitioner seeks to terminate parental rights based upon the "failure to make reasonable progress" under subsection 1(D)(m)(ii), the petitioner is required to file a pleading specifying the nine-month period or periods relied upon. 750 ILCS 50/1(D)(m) (West 2020).

¶ 35 "Reasonable efforts" relate to the goal of correcting the conditions that led to the child's removal from the parent. *In re R.L.*, 352 Ill. App. 3d at 998. Reasonable efforts are judged by a subjective standard and focus on the amount of effort that is reasonable for the specific parent involved. *In re R.L.*, 352 Ill. App. 3d at 998. The court must determine whether the parent has made earnest and conscientious strides toward correcting the conditions that led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24.

¶ 36 In contrast, "reasonable progress" is an objective standard that focuses on the amount of progress made toward the goal of returning the child to the parent. *In re C.M.*, 305 Ill. App. 3d 154, 164 (1999). Reasonable progress requires, at a minimum, measurable or demonstrable movement toward the goal of reunification. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. If a service plan has been established to correct the conditions that were the basis for the removal of the child from the parent, a "failure to make reasonable progress" includes a parent's failure to substantially fulfill his obligations under the service plan. 750 ILCS 50/1(D)(m) (West 2018). "Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006).

¶ 37 Initially, we consider whether the trial court's finding that Father failed to make reasonable efforts toward the return of the minor during the nine-month period after the adjudication of neglect was against the manifest weight of the evidence. In this case, E.A. was removed from Father's care because Father's substance abuse impaired his ability to adequately supervise, protect, and care for E.A. Father's caseworker created a service plan

14

for Father in November 2019, and she recommended that Father obtain assessments for substance abuse, mental health, and domestic violence issues, and complete any recommended treatment programs. Father was also asked to obtain safe and appropriate housing. On December 10, 2019, the trial court adjudicated E.A. as a neglected minor. Father's caseworker testified that Father completed an assessment for mental health and substance abuse on December 31, 2019, but thereafter failed to follow through with any of the recommended counseling and treatment within the nine-month period following the adjudication of neglect. Father completed a domestic violence assessment in March 2020, but he attended only two sessions and was unsuccessfully discharged from the program for repeated absences. In addition, Father failed to secure safe and stable housing. Father's caseworker testified that Father's efforts were unsatisfactory for all of the services recommended in his service plan. Father did not testify during the fitness hearing, and he presented no evidence to rebut the casework's testimony. Upon considering the evidence of Father's efforts under a subjective standard, based upon what was reasonable for him, the trial court found that Father failed to make reasonable efforts toward correcting the conditions that led to the removal of the child within the nine-month period after the adjudication of neglect.

¶ 38    Nevertheless, in this appeal, Father argues that at the time of the fitness hearing, he had been engaging in mental health, substance abuse, and domestic violence treatment programs, and he had learned through counseling to be responsible and hold himself accountable. Father also argues that he had bonded with E.A. and had regularly visited with her. He asserts that his recent efforts demonstrate that he has made earnest and

conscientious strides towards correcting the conditions which led to his loss of custody. In this case, Father offered no reasonable explanation for his lack of effort during the nine-month period following the adjudication of neglect, other than his acknowledgement that initially he "was not ready to get with the program." Even if the evidence of Father's belated efforts had been considered, those efforts do not demonstrate earnest and conscientious strides toward correcting the conditions that led to the removal of E.A. from the home. After considering the evidence presented during the fitness hearing, we find that the trial court's determination that Father was unfit for failing to make reasonable efforts to correct the conditions that were the basis for removal of E.A. during the nine-month period following the adjudication of neglect was not against the manifest weight of the evidence.

¶ 39    Father next contends that he made reasonable progress toward the return of the minor within nine months after the adjudication of neglect. He argues that reasonable progress does not require a parent to satisfactorily complete all recommendations in the service plan, but rather requires a parent to make progress toward the goal of reunification. He claims that despite his slow start, he was engaging in services prior to the hearing and that he made "minimum measurable movement" toward that goal.

¶ 40    In measuring a parent's progress toward reunification, the trial court considers the parent's compliance with the service plan and the court's directives in light of the conditions that led to the child's removal and subsequent conditions that would prevent the court from returning the child to the custody of the parent. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. Again, reasonable progress has been made when the trial court can

16

conclude that the child will be able to return to parental custody in the near future. *In re Daphnie E.*, 368 Ill. App. 3d at 1067.

¶ 41   As previously discussed, Father's service plan was created in November 2019. As part of the service plan, Father was referred for treatment of substance abuse, mental health, and domestic violence issues. On December 10, 2019, the court adjudicated the minor neglected. During each of the subsequent permanency review hearings that followed the adjudication of neglect, the trial court repeatedly admonished Father to work toward completing the recommended services. During the nine-month period after the adjudication of neglect, Father failed to engage in any of the recommended mental health and substance abuse programs, and he was discharged from a domestic violence program due to repeated absences. In September 2020, Father admitted to his caseworker that he was still using drugs. In addition, Father failed to obtain satisfactory housing. Father's caseworker testified that Father was unsatisfactory in all areas of his service plan. Contrary to Father's contention, there was clear and convincing evidence that Father failed to make any measurable movement toward reunification during the period from December 2019 through September 2020. Based upon this record, the trial court's determination that Father was unfit for failing to make reasonable progress toward the return of the minor during the nine-month period following the adjudication of neglect was not against the manifest weight of the evidence.

¶ 42                B. Determination of the Child's Best Interest

¶ 43   After finding that a parent is unfit, the trial court's focus shifts to the child, and the trial court considers the child's needs and whether the termination of parental rights is in

17

the child's best interest. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). At the best interest hearing, the State must prove termination of parental rights by a preponderance of the evidence. *In re D.T.*, 212 Ill. 2d at 365-66. In determining the child's best interest, the trial court considers several statutory factors including: the child's physical safety and welfare; the development of the child's identity; the child's familial, cultural, and religious background; the child's sense of attachment, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative for the child; the child's wishes and long-term goals, the child's community ties; the child's need for permanence; the uniqueness of every family; the risks related to substitute care; and the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2020). The trial court's best interest determination will be reversed only if it is against the manifest weight of the evidence. *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 44 In this case, the evidence presented at the best interest hearing revealed that E.A. was thriving with her foster parents. E.A. showed definite improvements in her speech, motor development, and social interactions. When considering E.A.'s health, the trial court found that E.A.'s foster parents were in a better position to provide for her physical safety, health, and welfare. The court considered evidence that E.A.'s foster parents attended to E.A.'s medical needs, and they encouraged E.A.'s participation in speech and occupational therapy. The evidence also showed that the foster parents had worked with persons from E.A.'s school to develop an IEP to accommodate E.A.'s medical needs. Due to E.A.'s rare epileptic condition, the trial court expressed concern about E.A. missing medication and suffering from seizures if returned to Father. The court considered Father's background

18

and found that raising a child with medical issues was too much for Father to handle at that time. The court pointed out that it could take years before Father would be back on track with his life.

¶ 45 The trial court also considered the strong connection between E.A. and her foster family. E.A. not only bonded with her foster parents, but also with their children, who treated E.A. as a sister. The court recognized that Father had a strong bond with E.A. and that he loved her, and also that he struggled to participate in services that had been recommended for him. The court noted that Father had an amicable relationship with the foster parents. Father testified that E.A. was in a positive environment with the best people he knew. He did not dispute that the foster parents provided an affectionate, stable environment. The court concluded that the foster parents provided a sense of attachment, security, and familiarity, as well as permanency and stability.

¶ 46 The record shows that the trial court considered the statutory factors in determining the child's best interest. Based upon the evidence presented, the court's determination that it was in E.A.'s best interest to terminate Father's parental rights was not against the manifest weight of the evidence.

¶ 47 III. CONCLUSION

¶ 48 Based upon the evidence presented, the trial court's determinations that Father was an unfit parent, and that it was in E.A.'s best interest to terminate Father's parental rights, were not against the manifest weight of the evidence. Accordingly, the judgment is affirmed.

¶ 49    Affirmed.