**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 210243-U

Order filed October 27, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| *In re* N.C. and A.C., | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Minors | ) | Will County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | Appeal Nos. 3-21-0243, 3-21-0244 |
| Petitioner-Appellee, | ) | Circuit Nos. 17-JA-19, 17-JA-20 |
| | ) | |
| v. | ) | |
| | ) | |
| Kelvin C., | ) | The Honorable |
| | ) | John J. Pavich, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE DAUGHERITY delivered the judgment of the court.
Justices Holdridge and Lytton concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*: In an appeal in a termination of parental rights case, the appellate court held that any error in the admission of evidence at the parental unfitness hearing would not warrant a reversal in this case because: (1) the trial court's finding of parental unfitness was well-supported by properly admitted evidence; and (2) the biological father (respondent) had invited or acquiesced in the admission of the improper evidence. The appellate court, therefore, affirmed the trial court's judgment, terminating the respondent's parental rights to his minor children.

¶ 2 In the context of juvenile-neglect proceedings, the State filed petitions to involuntarily terminate the parental rights of respondent father, Kelvin C., to his minor children, N.C. and A.C. After hearings on the matter, the trial court found that respondent was an unfit parent/person and that it was in the children's best interest to terminate respondent's parental rights. Respondent appeals, claiming that the trial court's decision should be reversed and remanded because certain evidence was improperly admitted at the parental unfitness hearing. We affirm the trial court's judgment.

¶ 3 I. BACKGROUND

¶ 4 Respondent and Tiarra H. were the biological parents of the minor children, A.C. (born in January 2015) and N.C. (born in July 2016). In March 2017, when N.C. was eight-months old, the family came to the attention of the Department of Children and Family Services (DCFS) after medical staff, who were treating N.C. at the hospital for possible pneumonia, saw that N.C. had multiple rib fractures. The fractures did not appear to be accidental in nature. At the time that the injuries were discovered, N.C. and A.C. were living with their mother (Tiarra) and her boyfriend (not the respondent). Tiarra allegedly did not know how the fractures had occurred, although she later indicated that N.C.'s injuries took place while her boyfriend was watching N.C.[1] DCFS subsequently took protective custody of both children and filed juvenile neglect petitions in the trial court, alleging that the children had been subjected to an injurious environment. Respondent was given a court-appointed attorney to represent him in the juvenile-court proceedings. A paternity test was later ordered, and respondent was found to be the biological father of N.C. and A.C.

---

[1] The children did not live with respondent at that time, and there is no allegation or suggestion in this case that respondent caused N.C.'s injuries.

¶ 5    In July 2017, an adjudicatory hearing was held on the neglect petitions. Respondent and Tiarra admitted the allegation contained in the petitions. Based upon those admissions, the trial court found that N.C. and A.C. were neglected minors.

¶ 6    A dispositional hearing was held the following month. At the conclusion of the hearing, the trial court found that respondent and Tiarra were unfit parents. The trial court made the children wards of the court and named DCFS as the children's guardian. The permanency goal was set at that time for the children to be returned home within 12 months.

¶ 7    Over the next several years, numerous permanency review hearings were held in this case. The first four permanency review hearings were held in March 2018, October 2018, April 2019, and October 2019. For each of those hearings, a permanency review report and a copy of the most recent service plan were filed with the trial court. Respondent was not present in court for those hearings, although his attorney was present in court on his behalf. At the conclusion of each hearing, the trial court found that respondent had not made reasonable efforts or reasonable progress. The trial court, however, did not change the permanency goal of the children.

¶ 8    In November 2019, the State filed motions to terminate respondent's parental rights to N.C. and A.C.[2] In the motions, the State alleged that respondent was an unfit parent/person as defined in the Adoption Act because: (1) he had failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare (see 750 ILCS 50/1(D)(b) (West 2012)); (2) he had failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children (see 750 ILCS 50/1(D)(m)(i) (West 2012)); (3) he had failed to make reasonable progress toward the return home of the children within the initial nine-month period after the adjudication of neglect from July 13, 2017, to April 13, 2018 (see 750 ILCS

---

[2] The State also sought to terminate Tiarra's parental rights to the children as well.

50/1(D)(m)(ii) (West 2012)); and (4) he had failed to make reasonable progress toward the return of the children during any nine-month period after the end of the initial nine-month period following the adjudication of neglect from April 14, 2018, through January 14, 2019; January 15, 2019, through October 15, 2019; and October 16, 2019, through the present date (see 750 ILCS 50/1(D)(m)(iii) (West 2012)).[3,4]

¶ 9        The next two permanency review hearings were held in June and October 2020.  For each of those hearings, a permanency review report and a copy of the most recent service plan were filed with the trial court.  Respondent was present in court for the hearings and was represented by his attorney.  At the conclusion of each hearing, the trial court again found that respondent had not made reasonable efforts or reasonable progress but did not change the children's permanency goal.

¶ 10        In March 2021, a status hearing was held in this case.  At the conclusion of the status hearing, the trial court changed the permanency goal of the children to substitute care pending a court ruling on termination of parental rights.

¶ 11        The following month, in April 2021, the final permanency review hearing was held in this case.  As with the prior hearings, a permanency review report and a copy of the most recent service plan were filed with the trial court for the hearing.  Respondent was present in court for the hearing and was represented by his attorney.  At the conclusion of the hearing, the trial court made no finding as to whether respondent had made reasonable efforts or reasonable progress.

---

[3] Although the motion to terminate parental rights was filed in 2019, it appears that the State was using the statutory language from a prior version of the Adoption Act in the motion.

[4] The State alleged an additional ground as to N.C. for a finding of parental unfitness but did not pursue that ground at the parental unfitness hearing.

¶ 12		In May 2021, an evidentiary hearing was held on the parental unfitness portion of the termination petitions. Respondent was present in court for the hearing and was represented by his attorney. During its case-in-chief, the State asked the trial court to take judicial notice of all of the permanency review orders entered in the present case.

¶ 13		The State also called the current caseworker, Latasha Bonds, to testify as its only witness.[5] Bonds testified that she had been the caseworker for the children's cases since February 2019 and was familiar with the history of the cases. During the State's direct-examination, although Bonds was questioned at times about matters that occurred before she had become the caseworker, respondent's attorney did not object to those questions. Bonds testified that the cases originated in March 2017 when the children came into DCFS care. According to Bonds, the initial service plan required respondent to obtain a drug assessment, participate in individual therapy, perform random drug tests, obtain a mental health evaluation, participate in domestic violence counseling, and visit with the children. Respondent completed a parenting class in early 2018 but did not perform or complete any other services.

¶ 14		More specifically, as to respondent's contact with her, Bonds testified that after she became the caseworker in February 2019, the first time that she had contact with respondent was in November 2019 in court. At that court date, respondent asked Bonds about his services, and Bonds told respondent that he needed to come to the office to be re-evaluated and to get a copy of his service plan. Respondent did not comply. The next contact that Bonds had with respondent was in March 2020 when respondent called the agency to find out where the children had been placed after he learned that the children were no longer staying with their maternal

---

[5] Not all of the information presented here was brought out by the State in its direct-examination of Bonds. Some of the information was elicited in cross-examination but has been placed here for the convenience of the reader.

grandparents (the children had been moved to a traditional foster home in November 2019). Bonds told respondent that she could not give him the current foster parents' address. Respondent gave Bonds the address of where he was living in Minnesota at that time. Bonds did not have contact with respondent again until January or February 2021 when respondent sent Bonds an email asking what services he needed to complete. In response to that email, Bonds sent a copy of the service plan to respondent.

¶ 15    As for respondent's contact with the agency, Bonds testified that every six months, the agency sent out a diligent search request (a process that was used to try to find parents with whom the agency had lost contact or had not had contact) to try to locate respondent. If an address for respondent was found using the search request, a letter was sent to respondent at that address. The letter identified the agency, informed respondent that his children were in the agency's care, and told respondent that he needed to come to the agency office to be assessed for services. In this particular case, letters were sent to respondent in February and August 2019. Bonds, however, did not receive a response to those letters from respondent.

¶ 16    With regard to respondent's contact with the children, Bonds testified that according to the case file, respondent had not visited with the children in-person since July 2018. Respondent had allegedly told the previous caseworker during that same month that he was moving to Minnesota and was done with the case. To Bonds's knowledge, respondent did not have any in-person contact with the children after he moved to Minnesota, although Bonds had been informed by the maternal grandparents (the foster parents at the time) that respondent was having regular phone contact with the children. In addition, respondent did not send any cards or gifts to the children, as far as Bonds was aware. It was not until respondent came to court that he asked for visitation with the children. Bonds told respondent at that time that N.C. was

6

struggling with his behavior and that Bonds would do a referral to determine if it was in the best interest of the children to start having visits with respondent again. Bonds confirmed during her testimony that respondent was not the person who had physically abused N.C. or, at least, that no one had ever said respondent was the person who had physically abused N.C.

¶ 17    On cross-examination, respondent's attorney asked Bonds repeatedly about matters that occurred before Bonds was the caseworker to elicit information that was favorable to respondent. Bonds confirmed that she was not the caseworker at the time but did try to answer the questions based upon her knowledge of the case file. Upon such questioning by respondent's attorney, Bonds confirmed that the initial permanency review report indicated that respondent had made reasonable efforts but not satisfactory progress. Bonds also confirmed that respondent had completed parenting classes, established paternity, participated in the integrated assessment, had stable work, had visited weekly with his children at that time without issue, and had made monthly contact with the caseworker. Bonds denied, however, that respondent had completed a substance abuse evaluation. Additional permanency review reports showed that respondent had maintained phone contact with the children until at least October 2019.

¶ 18    After the State rested its case-in-chief, respondent testified on his own behalf. Respondent stated that he was 27 years old and lived in Minnesota. In 2017 (presumably when the case started), respondent was working as a cook. After the children were taken into DCFS care, respondent completed a parenting class and visited with the children. In September 2018, respondent moved to Minnesota to look for better opportunities. Prior to that time, respondent was living on the east side of Chicago, and the violence in his neighborhood was getting out of control. Respondent called and told the agency that he was moving to Minnesota. Respondent did not tell the agency that he was no longer interested in the children.

7

¶ 19       In Minnesota, respondent initially found a job working as a machine operator for $15 an hour. Respondent went to automotive school and got automotive certifications and also went to construction school and got OSHA and CPR certifications. Respondent later became a member of the pipefitters union. He was currently employed through the union and was making $22.50 an hour. Respondent was currently living in an apartment and was working on getting a house. He was involved in a relationship and was planning on getting married.

¶ 20       According to respondent, after he moved to Minnesota, he still had contact with the children through video chats with the grandparents. Respondent also went to visit the children one time in-person while the children were still living with the grandparents. The children knew who respondent was and referred to respondent as "[D]addy." When respondent talked to the agency while he was in Minnesota, he did not ask about whether he should be doing services; he just asked how the children were doing. Respondent did not know whether the agency wanted him to continue doing services. Respondent acknowledged during his testimony that he had not talked to the children for over a year but stated that he loved the children, that he still wanted to have contact with the children, and that he still wanted to be a part of the children's lives. Respondent also stated that he would perform any services required, that he had been participating in individual and couple's counseling in Minnesota for about a year, and that he had been looking into domestic violence counseling. Respondent had not, however, provided proof to the agency of the counseling he had attended. When respondent was asked why he did not have more contact with the agency or more visits with the children, he stated that he was trying to find more stable employment because he knew that he would need money to come see the children.

¶ 21    During his testimony, respondent acknowledged that Bonds felt that respondent had completely failed to work with the agency to have his children returned to him. According to respondent, he had worked with the previous caseworker more than he had worked with Bonds. Respondent established his paternity through the proceedings in this case and not through a separate family court proceeding. According to respondent, he made attempts over the last four years to cooperate with DCFS—he completed a parenting class, a domestic violence assessment, and a drug assessment, although Bonds would not have been aware of the drug assessment. Respondent also completed random drug tests for the prior caseworker until he before moved to Minnesota at the end of summer or beginning of fall 2018.

¶ 22    At the conclusion of the parental fitness hearing, after all of the evidence and arguments had been presented, the trial court found that the State had proven by clear and convincing evidence that respondent had failed to make reasonable progress toward the return of the children for all four of the nine-month periods listed in the termination petition. The trial court determined, therefore, that respondent was unfit parent/person. In making its determination, the trial court commented that its conclusion was supported by the testimony of Bonds and by the prior permanency review orders, of which the trial court took judicial notice. The trial court also noted that although respondent had made some significant progress in his personal life, he had not made reasonable progress toward having the children returned to him. The trial court made no ruling on any of the other grounds of parental unfitness alleged in the termination petition.[6]

---

[6] Although the written order indicates that the trial court also found that respondent failed to maintain a reasonable degree of interest, concern, or responsibility toward the children, the trial court's oral pronouncement of its ruling contained no such finding. See *In re K.L.S-P.*, 383 Ill. App. 3d 287, 294 (2008) (indicating that when there is a conflict between the trial court's written order and oral pronouncement, the oral pronouncement controls).

¶ 23     A best interest hearing was held immediately thereafter.  At the conclusion of the best interest hearing, the trial court found that it was in the best interest of the children to terminate respondent's parental rights.  The trial court terminated respondent's parental rights, set the children's permanency goal to adoption, and named DCFS as the guardian of the children with the right to consent to adoption.[7]  Respondent appealed.

¶ 24                                II. ANALYSIS

¶ 25     On appeal, respondent argues that the trial court erred in finding him to be an unfit parent/person.  More specifically, respondent asserts that it was improper for the trial court to consider at the parental unfitness hearing Bonds's testimony about the events that occurred prior to when Bonds became the caseworker because Bonds had no firsthand knowledge of those events and because the service plans about which Bonds testified were not admitted into evidence.  Respondent acknowledges that he did not object to that testimony at the parental unfitness hearing but asserts that we should reach the merits of that issue, nevertheless, as a matter of plain error.  Based upon that alleged error, respondent asks that we reverse the trial court's finding of parental unfitness and that we remand this case for a new parental unfitness hearing.

¶ 26     The State and the children argue that the trial court's finding of parental unfitness was proper and should be upheld. The State and the children assert that even if improper evidence was admitted, reversal is not required in this case because the trial court's finding of parental unfitness was amply supported by proper evidence and because respondent invited or acquiesced

_____

[7] The trial court also terminated the parental rights of Tiarra (the biological mother of the children).

in any error that occurred. The State and the children ask, therefore, that we affirm the trial court's judgment.

¶ 27        The involuntary termination of parental rights is governed by the provisions of both the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq*. (West 2018)) and the Adoption Act (750 ILCS 50/0.01 *et seq*. (West 2018)). See *In re D.T.*, 212 Ill. 2d 347, 352 (2004). In the first stage of termination proceedings in the trial court, the State has the burden to prove the alleged ground of parental unfitness by clear and convincing evidence. See 705 ILCS 405/2-29(2) (West 2018); *In re C.W.*, 199 Ill. 2d 198, 210 (2002). The proof of any single statutory ground will suffice. 750 ILCS 50/1(D) (West 2018); *C.W.*, 199 Ill. 2d at 210. A trial court's finding of parental unfitness will generally not be reversed on appeal unless it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). In this particular case, however, respondent does not directly challenge the trial court's finding of parental unfitness. Instead, respondent attacks the admissibility of evidence. The admissibility of evidence at a parental unfitness hearing is a matter that is within the sound discretion of the trial court, and the trial court's decision in that regard will not be reversed on appeal absent an abuse of discretion. See *In re A.S.*, 2014 IL App (3d) 140060, ¶ 28.

¶ 28        The rules of evidence in civil cases apply at a parental unfitness hearing. *In re J.G.*, 298 Ill. App. 3d 617, 629 (1998). In keeping with those rules, it has generally been held that at a parental unfitness hearing, a caseworker may not testify about the contents of a case file of which he or she has no personal knowledge.[8] See, *e.g.*, *In re M.H.*, 2020 IL App (3d) 190731, ¶ 20. Of course, to raise such an error on appeal, the aggrieved party must preserve the error for appellate

_____

[8] The opposite rule would apply as well in a parental unfitness hearing—that a caseworker who has direct knowledge of information within the case file because of his or her involvement in the case may testify about the contents of the case file. See, *e.g.*, *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 64.

11

review by objecting to the improper testimony in the trial court. See Ill. S. Ct. R. 366(b)(3)(ii) (eff. Feb. 1, 1994); *In re Lakita B.*, 297 Ill. App. 3d 985, 991 (1998). The failure to do so results in the forfeiture of the issue. See *M.H.*, 2020 IL App (3d) 190731, ¶ 15. However, an appellate court may still consider the issue, despite the forfeiture, under the plain error doctrine because the termination of parental rights affects a fundamental liberty interest. *Id.* Indeed, as our supreme court has recognized, "a reviewing court should not easily declare forfeiture of an argument directed at a decision to terminate [parental] rights." See *In re Br. M.*, 2021 IL 125969, ¶ 40.

¶ 29       In the present case, although respondent forfeited his claim of error by failing to object in the trial court to the allegedly improper caseworker testimony, we reach the merits of that issue under the plain error doctrine because of the fundamental liberty interest involved. See *M.H.*, 2020 IL App (3d) 190731, ¶ 15. Upon our review of the merits, we find that the complained-of portions of Bonds's testimony were indeed improper since Bonds did not have personal knowledge of what had occurred in the case prior to when she became the caseworker. See *id.* ¶ 20. That being said, we also find that a reversal is not warranted in this case for two reasons.

¶ 30       First, respondent was not prejudiced by the error because two of the four nine-month periods alleged (January 15, 2019, through October 15, 2019, and October 16, 2019, through the present date) were periods when Bonds was the caseworker and could properly testify about what had occurred. See *Z.J.*, 2020 IL App (2d) 190824, ¶ 64. As to those two periods, Bonds properly testified that respondent did not maintain contact with her or the agency, that respondent did not visit with the children, that respondent did not participate in counseling, and that respondent did not perform any other services. Bonds's testimony in that regard was generally corroborated by the permanency review orders, which found that respondent had failed

12

to make reasonable progress for the periods in question, and by respondent's own testimony. The properly admitted evidence overwhelmingly established that respondent had failed to make reasonable progress toward the return home of the children during the two nine-month periods when Bonds was the caseworker. See 750 ILCS 50/1(D)(m)(iii) (West 2012); *C.N.*, 196 Ill. 2d at 216-17 (describing the benchmark for measuring whether a parent has made reasonable progress as encompassing the parent's compliance with the service plans and the court's directives, in light of the condition that gave rise to the removal of the child, and in light of other conditions that later became known that would prevent the court from returning custody of the child to the parent); *In re J.A.*, 316 Ill. App. 3d 553, 565 (2000) (indicating that at a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of the return of the child). Thus, any error that resulted from Bonds's testimony about other nine-month periods when she was not the caseworker did not prejudice respondent. See 750 ILCS 50/1(D) (West 2018); *C.W.*, 199 Ill. 2d at 210 (recognizing that proof of a single ground of parental unfitness is sufficient to justify a trial court's finding that a person is an unfit parent/person).

¶ 31 Second, a reversal is also not warranted in this case, despite the admission of improper evidence at the parental unfitness hearing, because respondent invited or acquiesced in the admission of that improper evidence. See *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004) (stating that a party cannot complain about an error that the party induced the trial court to make or to which the party consented). It would be truly unfair in this case to allow respondent to benefit from that error when respondent elicited much of the same type of improper evidence in his cross-examination of Bonds at the parental unfitness hearing. See *id.* (indicating that the rationale behind the invited error rule is that it would be manifestly unfair to allow a party a second trial based upon an error which that party injected into the proceedings).

13

¶ 32                                   III. CONCLUSION

¶ 33          For the foregoing reasons, we affirm the judgment of the circuit court of Will County.

¶ 34          Affirmed.